492 F.2d 136
 Fed. Sec. L. Rep. P 94,191, 1973-2 Trade Cases 74,763,
1974-1 Trade Cases 75,084
 MANOR DRUG STORES and all other users of Blue Chips Stamps
who were entitled but failed to purchase stock of Blue Chip
Stamps, on behalf of themselves and all other persons
similarly situated, Plaintiffs-Appellants,
v.
BLUE CHIP STAMPS, a corporation, et al., Defendants-Appellees.
 No. 71-2223.
 United States Court of Appeals, Ninth Circuit.
 Oct. 15, 1973, As Modified on Denial of Rehearing and
Rehearing En Banc April1, 1974.
 
 J. J. Brandlin (argued), James E. Ryan (argued), Ray E. McAllister (argued), Los Angeles, Cal., for defendants-appellants.
 Thomas J. Ready (argued), Allyn O. Kreps, Michael D. Zimmerman, of O'Melveny & Myers, G. Richard Doty (argued), Peter W. James, David T. Peterson, of McCutchen, Black, Verleger & Shea, Los Angeles, Cla., for plaintiffs-appellants.
 G. Bradford Cook, Gen. Counsel, David Ferber, Solicitor, Richard E. Nathan, Asst. Gen. Counsel, Jerry W. Markham, Securities and Exchange Commn., Washington, D.C., for the amicus curiae.
 OPINION
 Before BROWNING, HUFSTEDLER, and CHOY, Circuit Judges.
 BROWNING, Circuit Judge:
 
 
 1
 The district court, 339 F.Supp. 35, dismissed appellants' complaint under section 10(b) of the Securities Exchange Act of 1934,[1] 15 U.S.C. 78j(b), and Securities and Exchange Commission Rule 10b-5,[2] claiming damages for alleged fraud in connection with an offering of stock of appellee Blue Chip Stamps to appellant and the class it seeks to represent. The court held that because appellant and other members of the class did not purchase the stock they lacked standing to sue under the rule announced in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952).[3] We conclude that it does not appear 'beyond doubt' that appellant 'can prove no set of facts in support of (its) claim which would entitle (it) to relief.' Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). We therefore reverse.
 
 The alleged facts are as follows.[4]
 
 2
 In 1963 the United States filed a complaint charging Blue Chip Stamp Company, Thrifty Drug Stores Co., Inc., and eight grocery chains with conspiracy to restrain trade and monopolization in the trading stamp business in California, in violation of the Sherman Act. This litigation was settled in 1967 by entry of a consent decree. See United States v. Blue Chip Stamp Co.,272 F.Supp. 432 (C.D.Cal.1967).
 
 
 3
 The defendants in the antitrust suit, other than Blue Chip Stamp Company, were major California retail merchandisers who used Blue Chip stamps to stimulate patronage in their businesses. They owned 90 per cent of Blue Chip Stamp Company's stock.
 
 
 4
 Other retailers who used Blue Chip stamps in their business but owned no stock in Blue Chip Stamp Company (a group that includes appellant and others in the class it seeks to represent) appear before the court in the antitrust proceeding as amicus curiae. They contended that Blue Chip Stamp Company was to have been a non-profit venture on behalf of all users of Blue Chip stamps, and that they (the non-stockholding users) in fact owned an equitable interest in Blue Chip Stamp Company and in the $20,000,000 in profits it had accumulated. They asked that this interest be recognized in the decree.
 
 
 5
 These claims and contentions on behalf of the non-stockholding retail users of Blue Chip stamps 'prompted the provisions' of the consent decree requiring the reorganization of Blue Chip Stamp Company. Under the reorganization plan eventually approved, Blue Chip Stamp Company was to be merged into a new company-- Blue Chip Stamps. The defendant stockholder-users were to be cent of the common stock of the new in the enterprise. This was to be accomplished by issuing to others 55 per company; 621,600 shares of the common stock of the new company were to be offered to the retail users of Blue Chip Stamps who were not stockholders of the old company. The shares were to be offered on a pro-rata basis determined by the quantity of stamps issued to each of these non-stockholding users during a designated period. The offering was to be made in units consisting of three shares of common stock and a $100 debenture for a cash payment of $101. Any of the 621,600 shares not purchased by the non-stockholding users were to be divested of 55 per cent of their interest sold on the open market.
 
 
 6
 The offer of debentures and stock to non-stockholding users was intended by the court and government to be, and was, a bargain. Each unit offered to the non-stockholding user for $101 had a reasonable market value of $315, as defendant-appellees knew.
 
 
 7
 Users who were stockholders in the old company (including the defendant-appellees in this case)[5] did not want the non-stockholding users to exercise their right to purchase stock in the new company. To accomplish their purpose they caused to be prepared and circulated a prospectus 'calculated to mislead and dissuade users not knowledgeable of the true value of said shares from purchasing said shares.' The prospectus repeatedly emphasized certain 'Items of Special Interest' as having an adverse effect upon the value of the offered stock.[6] 'Constant reference to said items was intended to, and did cause plaintiffs to be misled as to the true value of said shares.' When defendant-appellees offered 'their own' shares to the public a year later,[7] the prospectus then issued made no reference to any of these 'Items of Special Interest,' although they were as relevant (or irrelevant) on the date of the second prospectus as they had been on the date of the first.
 
 
 8
 Defendant-appellees, by these and other means, intended to and did mislead plaintiff-appellant and other user-offerees as to value of the stock. Plaintiff-appellant and others in the class it represents, relying upon these representations, 'were induced and did, in fact, not accept said offer and purchase said Units,' and were thereby damaged in the amount of the difference between the offering price of the units and their fair market value.
 
 
 9
 We are not satisfied that these allegations establish on their face that appellant is barred from maintaining the action by the judicially created 'purchaser-seller' prerequisite to standing to sue for damages under section 10(b) and Rule 10b-5.
 
 
 10
 The complaint alleges the use of a fraudulent scheme involving untrue statements and omissions in offering securities of Blue Chip Stamps for sale.
 
 
 11
 The statute and rule were intended to protect the purity of stock transactions from just such manipulative and deceptive practices that deprive potential investors of a reasonable opportunity to make informed and intelligent investment decisions.[8] It is obviously irrelevant to this purpose that the object of the deceptive practices was to prevent purchases rather than to induce them.[9] And Congress and the Commission cannot have intended to prohibit such fraudulent practices if they failed but not if they succeeded. The language of the statute and rule does not require such a bizarre result. The statute and rule are not confined in terms to consummated purchases or sales. They have often been applied where, as here, 'plaintiffs alleged that they had sought to enter a securities transaction as purchasers or sellers, but that the transaction was aborted as a result of the fraud of the defendants.' Mount Clemens Industries, Inc. v. Bell, 464 F.2d 339, 345 (9th Cir. 1972), citing Opper v. Hancock Securities Corp., 367 F.2d 157 (2d Cir.), affirming 250 F.Supp. 668 (S.D.N.Y.1966); Commerce Reporting Co. v. Puretec, Inc., 290 F.Supp. 715 (S.D.N.Y.1968); Goodman v. Hentz & Co.,265 F.Supp. 440 (N.D.Ill.1967); and Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y.1965). See also Walling v. Beverly Enterprises, 476 F.2d 393 (9th Cir. 1973).
 
 
 12
 It can hardly be doubted, therefore, that the Securities and Exchange Commission, or a private person having a sufficient interest,[10] could have obtained prophylactic injunctive relief against the defendants in a timely suit.
 
 
 13
 Thus the question is not whether the complaint alleges a violation of the statute and rule, but rather whether appellant is barred from suing for damages because it succumbed to the fraud and did not purchase the offered stock.
 
 
 14
 Like the provisions of the statute and rule relating to coverage,[11] the Birnbaum 'purchaser-seller' standing requirement is to be construed to accomplish Congress' purpose. Herpich v. Wallace, 430 F.2d 792, 806-807 (5th Cir. 1970), and cases there cited. If this were the sole consideration, standing would be allowed to any person whose investment decision was affected by fraud, whether the fraud caused him to buy or prevented him from doing so. In either case the fraud would frustrate Congress' purpose, as we have said; and, in either case, allowing the private remedy would serve to vindicate that purpose.[12]
 
 
 15
 The standing requirement rests in part upon other considerations, however.[13]
 
 
 16
 Cases allowing private suits for injunctive relief make it clear that the 'purchaser-seller' prerequisite to standing to sue for damages rests largely on the assumption that if plaintiff does not allege that he purchased or sold the stock involved in the fraud it is evident at the outset that his claim must fail 'both on proof of loss and the causal connection with the alleged violation of the Rule.' Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 547 (2d Cir. 1967). See also Britt v. Cyril Bath Co., 417 F.2d 433, 435-436 (6th Cir. 1969); cf. Rekant v. Desser, 425 F.2d 872, 881 (5th Cir. 1970); Boone & McGowan, Standing to Sue under SEC Rule 10b-5, 49 Texas L.Rev. 617, 646 (1971); Kellogg, The Inability to Obtain Analytical Precision Where Standing to Sue under Rule 10b-5 Is Involved, 20 Buffalo L.Rev. 93, 114-116 (1970).
 
 
 17
 This assumption is usually justified. Ordinarily there will be little proof (other than the non-purchaser's own opinion, after the loss) that the non-purchaser would in fact have purchased but for the fraud, and, if so, how much, when or at what price; also, generally, the potential number of non-purchasers will be without definable limit.
 
 
 18
 But this is not invariably true.
 
 
 19
 As we noted in Mount Clemens Industries, Inc. v. Bell, supra, a 'common link' among many of the cases allowing non-purchasers or non-sellers to sue for damages under the statute and rule is 'the existence of a contractual relationship between the parties.' 464 F.2d at 345. Such contracts often furnish objective evidence of the reality of a plaintiff's intention to purchase or sell but for the fraud, and thus of causation. They may also fix the price, quantity, and time of sale, thus making it possible to calculate damages. And the existence of such contracts permits a reasonable circumscription of a defendant's potential liability by identifying from among the limitless number of possible non-purchasers those few that the defendant chose to deal with himself. See Commerce Reporting Co. v. Puretec, Inc., supra, 290 F.Supp. at 719.
 
 
 20
 Under the allegations of this complaint, the consent decree involved here serves the same function as did the contractual relationship referred to in Mount Clemens. According to the complaint, the consent decree required defendant-appellees to offer particular securities to a specific, identifiable group of non-stockholding retail users of Blue Chip Stamps, including plaintiff-appellant, and plaintiff-appellant had a right to buy those securities at a fixed price and in a fixed amount.[14] The complaint alleges an objective measure of the amount of loss, based on subsequent sales by defendants. As to causation, the complaint alleges that the consent decree offer was intended to be and was a bargain; that units of securities having a market value of $315 were to be offered to plaintiff-appellant for $101-- a difference so great as to provide, prima facie, and objective basis for a factual inference that users properly informed rather than misled would have accepted the offer.[15] It is also alleged that 60 per cent of those non-stockholding users who did purchase the units offered them had information as to value not made available by defendant-appellees in the prospectus.
 
 
 21
 The facts foreshadowed by plaintiff-appellant's allegations may not be forthcoming, or the suggested inferences may be shown to be untenable. If such deficiencies become apparent in pretrial proceedings, they will justify judgment short of trial. Walling v. Beverly Enterprises, supra, 476 F.2d at 397. We hold only that dismissal on the face of the complaint was premature.
 
 
 22
 This holding does not undermine Mount Clemens. The allegations of the present complaint describe a highly unusual situation in which an unyielding insistence upon the existence of a contract to purchase as a prerequisite to relief would subordinate substance to form.
 
 
 23
 Reversed and remanded for further proceedings.
 
 HUFSTEDLER, Circuit Judge (dissenting):
 
 24
 The majority confers standing to bring private damage actions under section 10(b) and Rule 10b-5 upon persons who neither bought nor sold securities and who never contracted with anyone to do so. I cannot reconcile this result with existing authority in our circuit and elsewhere or with the legislative scheme of which the section and the rule are a part. The majority's justification for the result is that these nonpurchasing appellants, as members of a class benefited by a consent divestiture decree in an action to which they were not parties, had a special status that was equivalent to the status of an investor who had a contract to buy or to sell securities. I perceive no analogy between the two and no sound reason to create a fiction to expand the reach of section 10(b) damage actions.
 
 
 25
 The result reached by the majority is inconsistent with the holding and reasoning of this court's recent decision in Mount Clemens Industries, Inc. v. Bell (9th Cir. 1972) 464 F.2d 339. Mount Clemens held that the purchaser-seller rule governs standing to bring section 10(b) damage actions in the courts of this circuit. The court then concluded that the noncontractual status of the Mount Clemens nonbuyer was fatal to the maintenance of his section 10(b) claim. Similarly, the noncontractual status of the nonbuyer appellants herein should be held to bar their suit.[1]
 
 
 26
 The majority, however, attempts to bring appellants within the class of protected investors by saying that the consent decree serves the same function as did the contractual relationship referred to in Mount Clemens. The majority means that appellants' status under the consent decree is analogous to that of purchasers or sellers whose contracts to buy or to sell aborted because of deceptive practices forbidden by section 10(b) and who were given standing to sue in cases that were cited and distinguished in Mount Clemens.
 
 
 27
 The functions of a contract and of the consent decree are, however, not the same. A contract to purchase or to sell a security is the equivalent of a purchase or a sale because the statute by definition makes them equivalent.[2] As Mount Clemens explained, the unifying link among the cases granting standing to persons who did not buy or sell 'is the existence of a contractual relationship between the parties which elevated the plaintiffs to status of statutory purchasers or sellers.' (464 F.2d at 345.) A consent divestiture decree cannot function similarly because it is not a 'contract' within the meaning of the statute and because no statutory provision equates 'purchase' and 'offer pursuant to a consent decree.' The essential statutory link between the appellants and 'purchasers' is missing.
 
 
 28
 The gap cannot be filled by saying, as does the majority, that a contract and the consent decree render causation and damages equally provable. Assuming that this similarity exists, it is nonetheless irrelevant. The court in Mount Clemens concluded that the speculativeness of a cause of action was not a ground for denying standing. (464 F.2d 346 n. 11.) If speculativeness will not impair standing, a want of speculativeness cannot support standing. The ability of a plaintiff to prove causation and damages is relevant to the disposition of the merits, not to a determination of whether or not a certain plaintiff is properly before the court.
 
 
 29
 Furthermore, the appellants' ability to prove causation and damages cannot be likened to that of parties who have contracted to buy or sell. Their situations are dissimilar because a contract creates legal rights between the parties. Appellants had no duties and no rights created by the consent decree. The decree could not have been enforced against them, and they could not have enforced it, even if the parties to the action resulting in the decree had intended to benefit them specifically. (E.g., Buckeye Co. v. Hocking Valley Co. (1925) 269 U.S. 42, 46 S.Ct. 61, 70 L.Ed. 155; United States v. ASCAP (2d Cir. 1965) 341 F.2d 1003; Control Data Corp. v. IBM Crop. (D.Minn.1969) 306 F.Supp. 839, aff'd sub nom. Data Processing Financial & General Corp. v. IBM Corp. (8th Cir. 1970) 430 F.2d 1277. See Dahl, Inc. v. Roy Cooper Co. (9th Cir. 1971) 448 F.2d 17, 20.[3] Because the consent decree creates no rights or duties in appellants, their commitment and ability to purchase the offered securities are far less definite than in a case in which a contract binds the parties. This want of definiteness renders appellants far less able to prove causation and damages than those who have contracted to buy securities and negates the 'same function' conclusion that is the basis for the majority's grant of standing.
 
 
 30
 The foregoing analysis suggests that the majority does not succeed in bringing appellants within the ambit of the standing rule established in Mount Clemens; indeed, it does not really attempt to do so. To state that the consent decree serves the same function as a contract masks the majority opinion's real purport, which is the creation of an exception to the purchaser-seller rule.[4] The opinion attempts to justify the exception by (1) implying that the purchaser-seller rule is grounded solely on a policy of denying standing where either causation or damages is dubious,[5] and (2) arguing that appellants should have standing because they could prove both elements. Neither proposition withstands scrutiny.
 
 
 31
 Although the purchaser-seller rule is occasionally buttressed by observations about the difficulties of proof that would accompany an abandonment of the rule, no authority purports to say that the potential for proving causation and damages is the essence of the rule. On the contrary, a person who is either a purchaser or seller and who alleges deception, causation, and damages can bring the action even if his ability to prove his case is nil. (Cf. Mount Clemens Industries, Inc. v. Bell, supra, at 346 n.11.) He may promptly lose on a motion for summary judgment, but his action cannot be dismissed for lack of standing. The majority opinion's effort to find sustenance for its view of the purpose of the purchaser-seller requirement in suits seeking only injunctive relief is unavailing. The purchaser-seller rule has only peripheral relationship to suits for an injunction.[6] A rule that no one could obtain preventive relief who could not prove that the fraud had already been consummated would be quixotic. Moreover, expansion of standing to bring suits for injunctive relief does not entail the risk of strike suits or of exposure to imponderable liability that expanded standing in damage actions threatens.
 
 
 32
 The assertion that appellants are peculiarly able to prove causation and damages and thus are separable from all other nonbuyers is also faulty. The quantity of shares offered, the price, and the time of sale are general fixed in a securities offering. These factors, therefore, do not distinguish the offer to appellants from an offer of the same securities to the general public. Although the majority opinion says that the appellants' expectations are 'rights,' they are not legally cognizable rights. If the offer were withdrawn or the decree not complied with, appellants could not complain. The susceptibility of appellants' expectations to being so frustrated renders appellants' damages as difficult to prove as those of a plaintiff whose acceptance of an offer is 'thwarted by the intervention of an earlier or higher bidder.' Nor is it the case that causation is more easily proven by appellants than by a nonpurchasing public offeree. The majority opinion states, 'ordinarily there will be little proof (other than the non-purchaser's own opinion, after the loss) that the non-purchaser would in fact have purchased but for the fraud . . ..' The majority's position is reasonable, but irrelevant. One who has the opportunity to purchase securities may let the opportunity pass for want of ability to take it, for failure to notice the opportunity, or for misjudgment of the market. These considerations apply as strongly to appellants' case as they do to the case of public offerees. Appellants were as free to decline the bargain for the same reasons as any other nonbuyers. Appellants are in no better position than the public offerees to claim that if they had known the truth, they would have snapped up the bargain. The argument that a person not only adequately alleges damages, but also prima facie proves causation by stating a marked disparity between the value of the security and the offering price is startling. Any nonbuyer or nonseller could easily leap the causation hurdle if that proposition were true.
 
 
 33
 Appellants are therefore in the same legal position as were the nonbuying members of the general public to whom the same securities were subsequently made available by the consent decree and who, as appellants concede, have no standing to bring a section 10(b) damage action. Appellants cannot explain why their own situation is essentially different from other nonbuyers, except that they are a more discrete group than the general public and their disappointment can be assuaged for no more than $21,000,000, rather than many times that amount. Absent such a difference, the exception to the purchaser-seller rule that the majority seeks to establish is unjustifiable.
 
 
 34
 At the heart of the majority's inability to justify its exception to the purchaser-seller rule is what I believe to be a basic misunderstanding of the role of a standing requirement in the context of securities litigation. The majority apparently believes that any plaintiff who can credibly allege the substantive elements of a cause of action sould be granted standing. However, even if litigants can allege and even prove all of the elements of a section 10(b) damage claim, they nonetheless may lack standing. The standing doctrine is not designed to thwart actions by persons who have not suffered any injury from a wrong. It is a means of foreclosing actions by persons who have been hurt by wrongs, but who, for reasons of legislative, judicial, or social policy, are outside of the class of persons who are given a particular kind of remedy for the injury.[7] A federal standing requirement insures that litigants are sufficiently adverse to satisfy the case or controversy requisite of Article III of the Constitution, and it confines the persons who may bring suit to those whom Congress intended to provide the remedy invoked in a particular controversy. Appellants do not have standing because they are outside the class to whom Congress intended to extend the right to bring federal damage actions when it enacted section 10(b).
 
 
 35
 Congress could have preempted state law controlling deceptive practices in the marketing of these securities, and it would have given anyone injured by the practices condemned by section 10(b) a private federal damage remedy. It did neither. Instead, Congress created a scheme of private and public remedies superimposed upon state statutory and common law remedies. When confronted with a complex legislative scheme of this kind, the judiciary must be extremely careful not to upset the balances built into the scheme by lightly implying federal remedies or by diluting principles of standing. (Cf. SEC v. National Securities, Inc. (1969) 393 U.S. 453, 465, 467 n.9, 89 S.Ct. 564, 21 L.Ed.2d 668; Holloway v. Bristol-Myers Corp. (1973) 158 U.S.App.D.C. 207, 485 F.2d 986.)
 
 
 36
 An expansive difinition of the class given standing to pursue section 10(b) damage actions promises some incremental benefit in preventing deceptive practices in the marketing of securities, one of the principal purposes of the section. Expanding the class, however, entails costs as well as benefits. Incautious loosening of the purchaser-seller rule will generate federal litigation, increase the cost of marketing securities,[8] inject into securities marketing new risk factors that defy accurate assessment, expose offerors to draconian damage claims, and invite strike suits.[9] Securities markets are complex and sensitive institutions. Opening the valve, even a little, that controls the flow of section 10(b) damage actions can so far unsettle the market as to defeat, rather than to promote, the benevolent purposes of Congress in enacting the statute. (Cf. Herpich v. Wallace (5th Cir. 1970) 430 F.2d 792, 804.)
 
 
 37
 The purchaser-seller rule has maintained the balances built into the congressional scheme by permitting damage actions to be brought only by those persons whose active participation in the marketing transaction promises enforcement of the statute without undue risk of abuse of the litigation process and without distorting the securities market.
 
 
 38
 The majority implies that its exception to the purchaser-seller rule does no real harm because few litigants will be situated exactly as were these appellants. In my view, the majority underestimates the ingenuity of counsel, but, even if it did not, the position is jurisprudentially unsound because it does not create neutral principles of law. In drawing the standing line between deceived nonbuyers given closed-end opportunities to purchase securities pursuant to a consent decree (appellants) and deceived nonbuyers given opportunities to purchase securities on a while-they-last basis pursuant to the same consent decree (nonbuyer public investors), the majority has not supplied a rationale keyed to the statute and rule to support its conclusion.[10] Without such an underlying rationale, there are no enutral principles preventing the majority's 'causation and damages' or 'same function' terminology from being extended to all passive 'investors'.
 
 
 39
 To expand standing to nonsellers or to nonbuyers, like appellants, who have taken no affirmative action of any kind in reliance upon alleged deceptive statements invites litigation that has nothing to do with protecting the integrity of the marketing of securities. The passive investor could always await market developments without any risk, claiming deception caused nonbuying if the value of the securities proved more promising than the offerors' glum predictions and deception caused nonselling if a rosier prospectus was followed by a market decline. Meanwhile, securities offerors would be hard pressed to find language for prospectuses that would be sufficiently neutral to avoid potential damage suits from bystanders.
 
 
 40
 I would affirm.
 
 
 
 [1]
 Section 10(b) of the Act provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 . . . .e u
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 
 
 [2]
 The Rule provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.
 
 
 [3]
 This court adopted the Birnbaum rule in Mount Clemens Industries, Inc. v. Bell, 464 F.2d 339 (9th Cir. 1972). See also Lanning v. Serwold, 474 F.2d 716 (9th Cir. 1973); Walling v. Beverly Enterprises, 476 F.2d 393 (9th Cir. 1973)
 
 
 [4]
 Some minor details are drawn from material submitted by plaintiff-appellant to this court. They are appropriately considered as reflecting the nature of the facts that might have been established under the allegations of the complaint. See Herpich v. Wallace, 430 F.2d 792, 809 (5th Cir. 1970); Shell v. Hensley, 430 F.2d 819, 822 n. 8 (5th Cir. 1970)
 
 
 [5]
 Defendant-appellees are Thrifty Drug Stores Co., Inc., seven of the eight grocery chains that were defendants in the antitrust suit, the old Blue Chip Stamp Company, the new Blue Chip Stamp Corporation, and the members of the board of directors of the latter
 
 
 [6]
 On such item was the pendency of claims against the company said to 'aggregate approximately $29,000,000.' Defendant-appellees allegedly knew the claims 'were of insignificant merit'; they were settled for less than $1,000,000
 In addition to reference to the 'Items of Special Interest,' the complaint alleges other misleading statements, including an estimate that 97 1/2% Of the Blue Chip stamps issued by the new company would be redeemed when historically less than 90% Were redeemed. This alleged misrepresentation 'resulted in an understatement of earnings on stamp sales for the year prior to the offering of Six Million Dollars ($6,000,000) or about eighty per cent (80%).'
 
 
 [7]
 It is unclear from the complaint whether the unsold shares originally offered to non-stockholding users were eventually sold, and at what price. The complaint mentioned sales by defendants of 'their own' shares, although plaintiff-appellant's brief indicates that the same shares offered to them 'were offered to the general public one year later.' The facts may be resolved in further proceedings
 
 
 [8]
 Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Superintendent of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6, 12, 92 S.Ct. 174, 30 L.Ed.2d 209 (1971); Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); Herpich v. Wallace, 430 F.2d 792, 801, 805-806 (5th Cir. 1970); Kahan v. Rosenstiel, 424 F.2d 161, 173 (3d Cir. 1970); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 851-852, 858 (2d Cir. 1968)
 
 
 [9]
 See, e.g., Travis v. Anthes Imperial Ltd., 473 F.2d 515 (8th Cir. 1973); Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir. 1969)
 
 
 [10]
 Private parties may maintain an action to enjoin anticipated or continuing violations of 10(b) and Rule 10b-5 though they could not sue for damages. See Kahan v. Rosenstiel, 424 F.2d 161, 173 (3d Cir. 1970); Britt v. Cyril Bath Co., 417 F.2d 433, 436 (6th Cir. 1969); Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 546 (2d Cir. 1967)
 
 
 [11]
 Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Superintendent of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); SEC v. National Sec. Inc., 393 U.S. 453, 466-467, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). See also Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 594, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973)
 
 
 [12]
 See, e.g., Note, The Purchaser-Seller Requirement of Rule 10b-5, Reevaluated, 44 U.Colo.L.Rev. 151, 154-55 (1972); Boone & McGowan, Standing to Sue under SEC Rule 10b-5, 49 Texas L.Rev. 617, 631, 647 (1971); Ruder, Current Developments in the Federal Law of Corporate Fiduciary Relations-Standing to Sue under Rule 10b-5, 26 Bus.Law 1289, 1296 (1971); Whitaker, The Birnbaum Doctrine: An Assessment, 23 Ala.L.Rev. 543, 571 (1971); Note, Inroads on the Necessity for a Consummated Purchase or Sale under Rule 10b-5, 1969 Duke L.J. 349, 362-63 (1969)
 
 
 [13]
 A suggestion that additional considerations may exist that give different meanings to 'purchase' and 'sale' as these words are used to define coverage in the statute and rule, and as they are employed in connection with the Birnbaum 'purchaser-seller' doctrine of standing, appears in SEC v. National Sec., Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). The Court stated that in defining 'purchase' and 'sale' as these terms are used in the statute and rule to determine coverage, the question to be asked is 'whether (the) alleged conduct is the type of fraudulent behavior which was meant to be forbidden by the statute and the rule' (466-467, 89 S.Ct. 572). In a footnote at this point (467 n. 9, 89 S.Ct. 572) the Court added:
 'This case presents none of the complications which may arise in determining who, if anyone, may bring private actions under 10(b) and Rule 10b-5. This is a suit brought by the Commission; the terms 'purchase' and 'sale' are relevant only to the question of statutory coverage. Therefore there are no 'standing' problems lurking in the case.'
 
 
 [14]
 As defendant-appellees point out, plaintiff-appellant could not have directly enforced the decree. See Dahl, Inc. v. Roy Cooper Co., 448 F.2d 17, 20 (9th Cir. 1971). Indeed, the district court dismissed a claim based upon the theory that plaintiff-appellant's damage arose out of a violation of the consent decree, and that ruling was not appealed
 The rule referred to does not bar the claim before us, however. This claim rests upon the theory that plaintiff-appellant was damaged by a violation of the Securities Exchange Act of 1934 and Rule 10b-5 prohibiting fraud in connection with the purchase or sale of securities. The fact that the securities transaction that is the subject matter of the claim was mandated by the consent decree does not immunize defendant-appellees from the statutes and rules regulating securities transactions. Plaintiff-appellant relies upon a breach of a duty imposed by these statutory anti-fraud provisions, not upon a breach of a duty imposed by the consent decree.
 
 
 [15]
 An informed decision by plaintiff-appellant to purchase these shares could not have been thwarted by the intervention of an earlier or higher bidder, as in Mount Clemens Industries, Inc. v. Bell, 464 F.2d 339, 346 n. 11 (9 Cir. 1972)
 
 
 [1]
 Unless some relevant distinction between the nonpurchasers in this case and the nonpurchasers in Mount Clemens can be asserted, appellants herein must, on authority of Mount Clemens, be denied standing. To be significant, the distinction must be one which would have made a difference in outcome under the reasoning of Mount Clemens
 The majority opinion explicitly suggests only one distinguishing feature between the two cases: 'An informed decision by plaintiff-appellant to purchase these shares could not have been thwarted by the intervention of an earlier or higher bidder, as in Mount Clemens . . ..' This disitnction, however, is irrelevant.
 The Mount Clemens court made it clear that the difficulty that plaintiffs therein would have had in proving that they could have purchased the securities in question was not of governing significance in that case: 'While we agree with the District Court that the claim of the appellants is highly speculative, that circumstance alone could not necessarily deprive them of the opportunity to prove a set of facts entitling them to relief.' 464 F.2d 346 n. 11. The court then went on to indicate the factor that was of governing significance: 'The lack of an agreement, however, does distinguish the present case from those decisions which permit aborted purchasers and sellers to maintain an action for damages.' Id.
 The distinction through which the majority in this case seeks to avoid the result in Mount Clemens, therefore, is irrelevant, for even if the claim of the plaintiffs in Mount Clemens had been less speculative than the appellants' claim in this case, the result in Mount Clemens would have been the same. Because plaintiffs therein would nonetheless have been neither actual buyers nor contractual 'purchasers', they would have been denied standing. Similarly, if the outcome in this case is to be in accord with the reasoning in Mount Clemens, appellants must be denied standing because appellants in this case neither actually acquired shares nor entered into contracts for their acquisition.
 
 
 [2]
 Securities Exchange Act of 1934, 3(a), 15 U.S.C. 78c(a):
 ' . . . .cha
 '(13) The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire.
 '(14) The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of.'
 
 
 [3]
 A persuasive rationale for refusing to accord nonparties standing to enforce a consent decree is that the potential exposure to litigation and to liability that a contrary rule would engender would seriously impair the settlement of litigation. The public interest in obtaining consent decrees outweights the interest of the nonparty litigants in obtaining direct vindication of their private interests. Control Data Corp. v. IBM Corp. (D.Minn.1969) 306 F.Supp. 839, 846. If administration of the antitrust laws would be ill served by allowing direct enforcement of consent decrees by third parties, it is difficult to understand how it would be better served by the creation of 'rights', like that created by the majority opinion, that permit indirect enforcement of the decrees
 
 
 [4]
 The purchaser-seller rule has heretofore been understood to dictate that if a plaintiff in a section 10(b) private damage action is neither a purchaser nor a seller, he does not have standing to sue. To justify its conclusion that appellants have standing, therefore, the majority either must conclude that appellants are purchasers or sellers or must seek to modify the previously established meaning of the purchaser-seller requirement. The former conclusion cannot be sustained. The majority opinion, therefore, must be viewed as arguing for the latter conclusion
 The majority in essence establishes a second basis upon which to claim standing. Under the logic of the majority opinion, a plaintiff may bring suit if either he is a purchaser or seller or he is able to prove causation and damages. The purchaser-seller rule ceases to be operative in all cases; its applicability becomes conditional upon the plaintiff's inability to prove his cause of action.
 The majority apparently believes that this is no departure from prior precedent, for it writes of 'the cases allowing non-purchasers or non-sellers to sue for damages under the statute and rule.' No cases allowing such plaintiffs to sue are cited. Concededly, the majority cites several cases in which the strict purchaser-seller rule was relaxed somewhat. The relaxation that those cases countenance, however, is of a different sort altogether than that which the majority proposes. The majority proposes to uncouple the standing requirement from the purchaser-seller rule. The 'forced seller' and 'aborted purchaser-seller' cases to which the majority refers suggest only that the words 'purchaser' and 'seller' be liberally defined. They do not suggest that the words become altogether irrelevant and the rule of which they are a part become inoperative in certain contexts.
 
 
 [5]
 If the majority were to fail to assert that this policy is the sole basis for the purchaser-seller rule, the logic of the opinion would fail. Even though some policies underlying the standing requirement were satisfied in a given case, if there were also other purposes to be met, standing would not properly be granted unless the majority were to show that the other policies also were not ill served by allowing appellants to sue
 
 
 [6]
 Of the three cases cited by the majority, none explicitly discussed the purchaser-seller requirement, and two involved plaintiffs who were in fact purchasers or sellers. Britt v. Cyril Bath Co. (6th Cir. 1969) 417 F.2d 433, 435. Compare Rekant v. Desser (5th Cir. 1970) 425 F.2d 872, 876-879 with id. 879-882
 
 
 [7]
 The Supreme Court has described the law of standing as a 'complicated specialty of federal jurisdiction, the solution of whose problems is in any event more or less determined by the specific circumstances of individual situations.' United States ex rel. Chapman v. Federal Power Comm'n (1953) 345 U.S. 153, 156, 73 S.Ct. 609, 612, 97 L.Ed. 918
 
 
 [8]
 Under the majority's rule, securities traders would not only have to insure against potentially crippling damages, they would also have to bear increased compliance costs. The accuracy of a representation with regard to a security is usually judged by hindsight; if the price of the security rises substantially, prior representations may seem unduly conservative; if it falls, too optimistic. Under the purchaser-seller rule, offerors can protect themselves against unforeseen impositions of liability by acting with judicious restraint when dealing with others; they need merely avoid inaccuracies that induce others to act. If passive 'investors' were also allowed to sue, such self-protective conservatism might prove suicidal, for an offeror would have to be micrometrically accurate. If securities traders are to be held responsible for lapses in such exactitude, the costs of accumulating, verifying, and presenting the necessary data would soar
 
 
 [9]
 The great ease with which plaintiffs can allege the requirements for the majority's standing rule and the greater difficulty that plaintiffs are going to have proving the allegations suggests that the majority's rule will allow a relatively high proportion of 'bad' cases into court. The risk of strike suits is particularly high in such cases; although they are difficult to prove at trial, they are even more difficult to dispose of before trial
 
 
 [10]
 The majority opinion would allow standing to sue if the misled nonbuyer were one of 10 offerees who could buy no more than 10,000 shares each of a 100,000-share offering, but it would deny standing if the nonbuyer were identically misled as to the same shares, but he was one of 11 offerees of 10,000 shares of the same offering to be sold on while-they-last terms. Why?