**Robert K. BURNS et al., Plaintiffs-Appellants,**

v.

**Stuart R. PADDOCK, Jr., et al., Defendants-Appellees.**

**No. 73–1243.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 25, 1974.

Decided Sept. 5, 1974.

Rehearing Denied Oct. 4, 1974.

Edward L. S. Arkema, Robert Plotkin, Chicago, Ill., for plaintiffs-appellants.

Edward L. Foote, Chicago, Ill., for defendants-appellees.

Before PELL, STEVENS, and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

Plaintiffs-appellants John R. Malone and George M. Hilgendorf appeal from the district court's dismissal of their first amended complaint (hereinafter designated complaint) and denial of their motion for a preliminary injunction.[1]

The action arises from plaintiffs' purchase of a minority interest in the Paddock corporation, a close corporation engaged in the business of publishing community newspapers.[2] The defendant Stuart R. Paddock, Jr., Robert Y. Paddock, and Margie Flanders (Paddock) are brothers and sister. During the period in question, the Paddocks were directors and the majority shareholders in the Paddock corporation. Defendant Andrew Lamb was not associated with the corporation at the time of plaintiffs' purchases but later became an officer and director of the company.

The complaint contained five counts,[3] each proposing an alternative theory of

---

1. Robert K. Burns was also listed as a plaintiff in the first amended complaint. He has, however, not appealed from the district court's decision although his investment in the stock involved in this litigation was $637,500 as contrasted with a total of $282,500 for the two appellants.

2. According to the complaint, the Paddock corporation is a Delaware corporation having its headquarters and principal place of business in Illinois.

3. We are somewhat uncertain as to whether plaintiffs' complaint should be characterized as inartful since it might well be thought of as artful. It certainly exceeds what is thought of as notice pleading. In some instances the averments proceed into details which, while commendably candid, are prima facie inconsistent with the arguments advanced on appeal. The relief sought is stated at the end of count V and is partially hazy in its matching relationship to the various counts. No count is complete within itself but each is dependent upon reference-incorporated allegations from another count or other counts. Thus, it is stated, albeit nonspecifically, in count I, paragraph 18, that "[d]efendants' conduct complained of herein includes their unlawful acts alleged in counts II, III and IV hereof, which are incorporated herein by reference." Counts II, III, IV,

liability. Count I was based on section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), Rule 10b–5 of the Securities Exchange Commission (17 C.F.R. § 240.10b–5), and section 17 of the Securities Act of 1933 (15 U.S.C. § 77q).[4] Counts II and III were based on the same federal statutes and rule as Count I plus the Illinois common law. Counts IV and V were based on the Delaware and the Illinois common law. Jurisdiction was based on section 22(a) of the Securities Act of 1933 (15 U.S.C. §

77v(a)), section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa), and the doctrine of pendent jurisdiction. The plaintiffs sought damages as well as declaratory and injunctive relief.

The district court dismissed the complaint for failure to state a claim upon which relief could be granted.[5] At the same time the district court denied the plaintiffs' petition for a preliminary injunction. The plaintiffs appeal from these orders.

and V "repeat and reallege paragraphs 1 through 17 of Count I." We will set forth the basis or theory of each count, insofar as they can be disentwined, as the subject has been treated by the parties.

4. Section 10(b) of the Securities Exchange Act of 1934 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange.

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

Section 17 of the Securities Act of 1933 provides:

"(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce

or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

(b) It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communications which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

(c) The exemptions provided in section 77c of this title shall not apply to the provisions of this section."

5. Plaintiffs contend that the district court dismissed the complaint on the ground that the first three counts did not confer federal jurisdiction. Such a ruling, it is argued, was erroneous under the doctrine of Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), since the federal claims in plaintiffs' complaint were neither frivolous nor a mere matter of form. The district court's decision and order makes clear, however, that the basis for dismissing the complaint was a failure to state a claim upon which relief could be granted, not a lack of federal jurisdiction.

We note at the outset that, on a motion to dismiss, the allegations in the complaint must, of course, be taken as true with any reasonable inferences drawn in favor of the pleader. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### COUNT I.

Count I alleges that the defendants violated the federal securities fraud statutes and rules by inducing Malone and Hilgendorf to purchase securities in the Paddock corporation by means of promises which defendants did not intend to fulfill. In 1971, the Paddock corporation, according to the complaint, was in a "desperate" financial condition. Malone and Hilgendorf were, at that time, officers and directors of the company but not shareholders. During 1971, they and a number of their friends purchased securities in the company. The Paddock family, however, retained the majority interest (53%) of the voting stock.

The complaint alleges that, in making their investments, the plaintiffs relied upon certain oral promises made to them by defendant Stuart Paddock, Jr., who was then president of the company. The alleged promises were:

"(a) That for a period of ten years, control of the Company would be placed in the Minority Investors through the device of a voting trust agreement establishing a voting trust in which was to be placed all of the Paddocks' stock and which would be effectively controlled by Minority Investors.

(b) That no one would be permitted to become a director of the Company unless he owned at least one percent of the Company's stock.

(c) That the plaintiffs would occupy certain important offices and positions with the Company and play important roles in the management of the Company.

(d) That experienced outside professional management would be brought into the Company.

(e) That the Company would form, participate in and vigorously promote a group advertising sales operation known as 'super group,' to which other publishers would be invited to join."

The plaintiffs allege in their complaint that they would not have made the purchases of Paddock securities if these promises had not been made. They also allege that Stuart Paddock, Jr. made these promises with the intention of breaching them. The other defendants, according to the complaint, although it is asserted on information and belief, either authorized the promises or ratified them after they were made, all with the intention of not fulfilling them. All of the promises, it is alleged, have, in fact, been breached.[6] Finally, the plaintiffs allege that the defendants conspired to induce the plaintiffs to invest in the company, intending then to oppress the plaintiffs in a minority position until the plaintiffs agreed to sell their securities to the Paddocks at a price below the actual value of the securities.

The condition of the Paddock corporation has, the plaintiffs admit, vastly improved since they made their investments. The company has, nonetheless, allegedly lost a large amount of profits due to the defendants' failure to fulfill the promises.

Rule 10b–5 prohibits, *inter alia*, the employment of "any device, scheme, or artifice to defraud" in connection with the purchase or sale of any security. The district court dismissed count I on the ground that "broken promises do not rise to the level of fraud or a violation

---

6. The Paddocks breached the second alleged promise by making defendant Lamb a director even though Lamb did not own any stock in the company.

of Rule 10b–5." This was a misstatement of the law.

■ Where a promise is made with the intention of not keeping it, there is a scheme or artifice to defraud. Durland v. United States, 161 U.S. 306, 313, 16 S.Ct. 508, 40 L.Ed. 709 (1896). This court has specifically adopted the rule that a promise made with a deceptive intent violates the securities acts.

"The law has been long established that a scheme to defraud may consist of suggestions and promises as to the future, when not made in good faith but with deceptive intent." United States v. Herr, 338 F.2d 607, 610 (7th Cir. 1964), cert. denied, 382 U.S. 999, 86 S.Ct. 563, 15 L.Ed.2d 487 (1966). See also, Robinson v. Cupples Container Co., 316 F.Supp. 1362, 1366 (N.D.Cal. 1970); 1 A. Bromberg, Securities Law: Fraud § 4.2, at 72 (1973).

■ In the present case, Malone and Hilgendorf alleged, in their complaint, that the defendants never had any intention of fulfilling the promises made to plaintiffs. They further alleged that they relied on the promises in making their investments. Such assertions were, under the circumstances, sufficient to allege actionable fraud under the federal securities laws.

The defendants contend, however, that the dismissal of the complaint can be justified on other grounds. The complaint affirmatively establishes, the defendants argue, both a lack of reliance and a lack of damages.

■ We turn first to the question of reliance. The defendants' argument with respect to reliance is comprised of, essentially, two steps. First, the defendants argue that the only promise which this court need consider is the one concerning the voting trust. This is the crucial promise, it is argued, since the group controlling the voting trust would also control the performance of the other four promises. Second, the defendants contend that the facts stated in the complaint affirmatively establish that Malone and Hilgendorf did not rely on the promise that the minority investors would control the voting trust.

We disagree with both parts of the defendants' argument concerning the plaintiffs' reliance. First, we reject the contention that, in determining whether the plaintiffs relied on the five promises, we need only consider the promise concerning the voting trust. Initially, we note that the last three of the remaining four promises would be implemented by the board of directors not those voting the shares. While it may be ordinarily assumed that directors elected under circumstances such as the present ones will be puppetarily responsive to the will of those who placed them in office, this result does not always necessarily follow. Further, as many corporate directors are now aware there are fiduciary obligations imposed on board members, violation of which will result in exposure to individual liability. In any event, it could be anticipated that during certain time periods, e. g., when positions on the board became vacant by death or resignation, the board would not necessarily be responsive to the will of the voting trust.

Moreover, even assuming that minority control of the voting trust would, in most circumstances, be sufficient to guarantee fulfillment of the other four promises, these other four promises could, nevertheless, have been fulfilled by the defendants *without* giving the minority investors control of the voting trust. The defendants do not question the plaintiffs' allegation that they relied on these four promises.

Even assuming, arguendo, that the voting trust promise is the only relevant promise, we do not find that the complaint affirmatively establishes a lack of reliance on this promise. The facts regarding the voting trust, as disclosed by the complaint, are as follows. The trust agreement, which provided for five trustees, was signed prior to the actual investment by plaintiffs. The five persons originally designated to be trustees were: defendants Stuart Paddock, Jr. and Robert Paddock; plaintiff Malone; and mi-

nority investors Fred Goss and Norman Isaacs. However before the plaintiffs purchased the securities, Goss and Isaacs decided not to invest in the company. Defendant Flanders and plaintiff Hilgendorf were designated as trustees in place of Goss and Isaacs. The plaintiffs purchased the securities, according to the complaint, "on the basis that two of the trustees, plaintiffs Malone and Hilgendorf would be able on behalf of the Minority Investors, to control the voting of the stock held in the voting trust, because of a clear split in the family between Stuart R. Paddock, Jr., on the one side and his brother and sister on the other."

The defendants contend that since the plaintiffs knew, when they invested, that three of the five trustees were Paddocks, the plaintiffs could not have relied, in making their investments, on Stuart Paddock, Jr.'s promise that the minority investors would control the voting trust.

We find this argument unpersuasive. The plaintiffs may be able to prove at trial that Stuart Paddock, Jr., in making his promise, indicated that he himself would vote with the majority trustees if this proved necessary to insure minority control of the voting trust. If so, the plaintiffs could have continued to rely on Stuart Paddock Jr.'s promise of minority control even though three Paddocks were trustees—since if Stuart Paddock, Jr. voted with the plaintiffs, the minority investors would control the voting trust.[7] Thus, taking the facts in the light most favorable to the plaintiffs and construing all reasonable inferences in their favor, we conclude that with respect to the issue of reliance, the plaintiffs have alleged facts sufficient to withstand a motion to dismiss.[8]

■ We turn next to the defendants' contention that the dismissal of the complaint can be justified on the ground that the plaintiffs have failed to allege any legally recognizable damages. The defendants point out that, according to the complaint, the company has prospered since the plaintiffs invested.[9]

---

7. We have more difficulty, as may the plaintiffs on a trial, in discerning a basis of liability on the part of the defendants other than Stuart Paddock, Jr. According to the trust agreement, in the event of a vacancy in the trustee contingent, the first replacement trustee would have been the defendant Flanders, presumably allied with the Paddocks' interest. Thus there was no particular assurance to the plaintiffs at the time the agreement was executed that the minority control would actually continue as originally set up. The time period of Stuart's defection from the family is not alleged with specificity and it is not clear whether it supposedly existed at the time the first trust agreement was executed. However, the crucial time for our purposes is the time of the purchase of the stock. To prevail against the remaining defendants, it appears plaintiffs will have to demonstrate that at the time of the purchase, Stuart made the false representation as to his voting and that the others either by approval or ratification joined in the representation knowing at the time that it was false. While this requires a broad reading of the allegations of the complaint, as we have indicated all reasonable inferences are in favor of the pleader on a motion to dismiss.

8. The defendants also stress, with respect to the reliance issue, the fact that the plaintiffs were insiders at the time of their investments. In determining whether there has been a violation of the federal securities fraud provisions, a court should, of course, consider the "actual and normal business acumen" of the plaintiff. Kohler v. Kohler Co., 319 F.2d 634, 641–642 (7th Cir. 1963). See also, Myzel v. Fields, 386 F.2d 718, 736 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). In the present case, however, the plaintiffs would not have been aided by their positions as insiders in knowing that the defendants did not intend to fulfill their promises.

9. We do not read the plaintiffs' complaint as conveying quite the same meaning as do the defendants. The actual allegation in the complaint is that "[a]s a result of the money contributed to and obtained for the Company by the plaintiffs, and also due to many other efforts by the plaintiffs, the condition of the Company has vastly improved." It further appears from the complaint that as a result of the purchases by the plaintiffs and their friends of securities of the corporation, presumably treasury stock, $1,600,000

The plaintiffs allege, in their complaint, monetary damages in the amount of $50,000. At no time, however, do they explain how they arrived at this figure. Proving such damages may turn out to be very difficult if not impossible. Speculation on the difficulties of proof should not, however, figure in the disposition of a motion to dismiss. The plaintiffs should, under the doctrine of Conley v. Gibson, *supra*, be given an opportunity to specify the items they claim as damages.[10]

## COUNTS II AND III.

Counts II and III refer to certain activities occurring after Malone and Hilgendorf acquired their securities in the Paddock corporation. These activities allegedly violated the fraud provisions of the federal securities laws and the Illinois common law.

In count II, the plaintiffs allege that, subsequent to their investments, another corporation made an offer to purchase all of the securities of the Paddock company. Stuart Paddock, Jr., then president of the Paddock company, allegedly agreed with the minority investors to be a member of a team of stockholders which was to deal with the other corporation in connection with the offer. This was done, according to the complaint, "with a view toward causing the offer to be as favorable as possible to the stockholders." However, instead of acting toward this objective, Stuart Paddock, Jr. allegedly "denigrated" the value of the Paddock company in his discussions with representatives of the other corporation. As a result, the potential purchaser first reduced the amount of its offer and, eventually, withdrew the offer entirely: The plaintiffs again

allege that these actions were part of a conspiracy amongst the defendants whereby the defendants intended to lock the minority investors into a "defenseless" minority position until the minority agreed to sell their securities to the Paddocks at a price below their actual value.

Count III alleges that the plaintiffs have been negotiating with another corporation (not the corporation involved in count II) for the purpose of arranging a sale of the stock of the minority investors. The complaint further alleges that the Paddocks, through an unnamed representative, have threatened to do anything in their power to prevent such a sale by the Minority Investors." This representative of the Paddocks allegedly indicated that the proposed sale is not legally permissible and that the Paddocks will take extrajudicial steps to interfere with and prevent the sale. Finally, the plaintiffs allege that all of the defendants' acts and threats are without legal justification and are part of the same conspiracy referred to in counts I and II.

Counts II and III defy easy analysis in a securities law context because their lack of specificity makes them susceptible of various interpretations. The plaintiffs claim that these counts state causes of action under Rule 10b–5, but the plaintiffs fail to specify the elements essential to such an action. At best, the court is forced to infer crucial matters from ambiguous assertions. Nevertheless on a motion to dismiss, any doubts must, of course, be resolved in favor of the pleader. Jung v. K. & D. Mining Co., 260 F.2d 607, 608 (7th Cir. 1958).

---

was received by the company. Also the minority investors signed as guarantors "of certain large financial obligations of the Company." Such a substantial sum of money plus a backup of company obligations would be bound to bring about a vast improvement in a company which allegedly was on its last legs at the time of the transfusion. A vast improvement does not necessarily indicate that the plaintiff's stock in

which they had invested had the value it would have had if it were to have the perquisites normally adhering to majority control of share voting. The answer is not to be found without evidence.

10. With respect to the types of damages recoverable, see Madigan, Inc. v. Goodman, 498 F.2d 233 (7th Cir. 1974).

## A. *Fraud Allegations.*

■ A major problem, in both counts II and III, is the plaintiffs' failure to allege with specificity, the misrepresentations or fraudulent practices involved.

### Count II

In count II, this problem is compounded by the fact that there are two areas in which the misrepresentation or fraud could have occurred: (1) in the discussions between Stuart Paddock, Jr. and the potential buyer; and (2) in any promise made by Stuart Paddock, Jr. to the plaintiffs. The plaintiffs fail to specify at which of these occasions the fraud, if any occurred.

If the plaintiffs are relying on the first alternative, that is, Paddock's statements to the potential purchaser, a number of further problems arise. First, the complaint alleges that, at the meeting, Paddock "denigrated" the value of the Paddock company. Plaintiffs at no time specify what they mean by "denigrate"; this term does not necessarily connote a misrepresentation of fact.[11] Second, even if we assume the interpretation of "denigrate" most favorable to plaintiffs, *i. e.*, that Paddock made misrepresentations of fact, there is, nevertheless, no indication in the complaint of whether and how such misrepresentations were material. Third, the complaint does not state whether the plaintiffs were present at the meeting between Paddock and the potential buyer and had an opportunity to correct the misrepresentations.[12] Finally, there is an additional problem that Paddock addressed his statements regarding the company to the potential purchaser, not to the plaintiffs; it was the potential purchaser, not the plaintiffs, who relied on any misrepresentation (with the plaintiffs in the role of "third-party victim").

The plaintiffs may, on the other hand, be alleging that the fraud in count II arose out of a promise made by Stuart Paddock, Jr. to the plaintiffs. While the complaint does not directly state that such a promise was made, it does indicate that Paddock was to work "with a view toward causing the offer to be as favorable as possible to the stockholders." If a promise was made with the intention of not keeping it, there would be fraud under Rule 10b–5. United States v. Herr, *supra*. The plaintiffs, moreover, would clearly be the parties to whom the fraud was addressed in this situation. There still remains, however, the problem of showing that this promise was breached. The breach presumably occurred when Paddock "denigrated" the value of the company. But, here again, we are faced with the questions: what do plaintiffs mean by "denigrate"; if there were misrepresentations of fact, were these material; and did plaintiffs knowingly sit by and allow Paddock to make the misrepresentations.

### Count III

Count III is also ambiguous with respect to whether any fraud occurred. The complaint alleges that the Paddocks, through a representative, have "threatened to do anything in their power to prevent" the sale by the minority investors and that these threats "are without any legal justification." There is, however, no direct allegation of a misrepresentation of fact or of fraudulent or manipulative practices; nor is there a description of the specific nature of the "threats" directed at the plaintiffs.[13] In addition, in count III, as in count II, there is a failure to indicate the materi-

---

11. At least three interpretations are conceivable: (a) that Paddock defamed the company and in so doing knowingly misrepresented the facts; (b) that Paddock presented all the facts but emphasized the negative, but truthful, facts; (c) that Paddock stated his honestly-held, but pessimistic, opinion as to the company's outlook.

12. *See* Reed v. Riddle Airlines, 266 F.2d 314 (5th Cir. 1959).

13. *See* Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967), where the complaint indicated the nature of the alleged manipulative practices.

ality of any misrepresentations to the potential sale.

## B. *Sale Allegations.*

The other major area of ambiguity in counts II and III relates to the requirement in Rule 10b–5 that the fraud be "in connection with the purchase or sale of any security."[14] In both counts II and III, the complaint is unclear upon which of two possible sales the plaintiffs are relying: (1) the sale of the minority interest to the plaintiffs by the defendants (the allegations concerning this sale are incorporated by reference); or (2) the potential sales of all of the Paddock stock (count II) and the minority interest (count III). If the plaintiffs are relying on the first alternative, the court is faced with the situation of a fraud occurring some time after the sale. If, on the other hand, the plaintiffs are relying on the second alternative, the question arises as to whether a potential sale is a sale for the purposes of Rule 10b–5.[15] Because of the uncertainties of just what may come forth by way of proof under the ambiguous allegations, we decline to launch into a virtually unexplored area of the law in what, at least now, would be a gratuitous advisory opinion.

If the motion to dismiss had not been sustained, the factual situation would presumably have been spelled out sufficiently, either by summary judgment procedures or during a trial, to permit us to determine whether or not the plaintiffs had made a case. We cannot say, given the present exposition of counts II and III, that it appears beyond doubt that the plaintiffs can prove no facts sufficient to support a claim for relief under Rule 10b–5 or the state common law.[16] Upon remand the plaintiffs should be allowed to amend their complaint, particularly with regard to counts II and III, so as to place before the district court pleadings reflecting whether there is a basis for relief,[17] *i. e.,* insofar as the federal claim is concerned, whether plaintiffs "suffered an injury as a result of deceptive practices touching" a sales situation within the ambit of the statute. Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12–13, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

## COUNTS IV AND V.

Counts IV and V, based on Illinois and Delaware common law,[18] were before the district court under the doctrine of pendent jurisdiction. Both of these counts arise, essentially, from the breach of promises alleged in count I. Basically the same evidence which would be necessary to prove count I would be necessary to prove counts IV and V.

The district court, after finding no federal cause of action, dismissed these pendent claims. We would find no error in the dismissal of the pendent claims if the federal claims had been properly dismissed. United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The district court, however, also commented in

---

14. In Eason v. General Motors Acceptance Corp., 490 F.2d 654 (7th Cir. 1973), cert. denied 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed. 2d 312, this court held that a person need not be a purchaser or seller in order to bring an action under Rule 10b–5. *Eason* did not, however, dispense with the requirement in 10b–5 that there be a sale of a security.

15. *Cf.* Manor Drug Stores v. Blue Chip Stamps, 492 F.2d 136 (9th Cir. 1973).

16. Aside from the federal securities law, there may be pendent jurisdiction questions presented by counts II and III and much of what we say hereinafter as to counts IV and V would be applicable to II and III.

17. The defendants contend that the dismissal of the complaint should be affirmed at least as to Andrew Lamb. Although Lamb was not associated with the company at the time of plaintiffs' purchases, he joined the company shortly thereafter. The complaint alleges that Lamb ratified the false promises made by Stuart Paddock, Jr. and accepted the fruits of the fraud. In addition, the plaintiffs allege that Lamb was a co-conspirator with the Paddocks. The dismissal of Lamb cannot be sustained.

18. Count IV is based on both Illinois and Delaware common law; count V is based on Illinois common law.

its decision and order that even if count I had been allowed to stand, counts III, IV and V were not proper matters to inject into a federal controversy and he would have dismissed these counts in any event. We agree with the defendants that these remarks were not necessary to the district court's decision.

While the remarks were not more than *obiter dicta* and agreeing with the district court that under *Gibbs* the matter of entertaining a pendent jurisdiction case is ordinarily discretionary, we deem it necessary to reverse the order of dismissal as to these counts also for a proper analysis of the issue under the guidelines laid down in *Gibbs*. We have no proper basis for determining whether a dismissal of the pendent jurisdiction claims would be an abuse of discretion as the matter now stands.

## PRELIMINARY INJUNCTION.

Malone and Hilgendorf also appeal from the district court's denial of their motion for a preliminary injunction. Basically, the plaintiffs sought, in their petition for a preliminary injunction, to have the district court order the defendants to fulfill the five promises alleged in count I.[19]

■ A preliminary injunction is proper only where there is a showing that: (1) plaintiffs have no adequate remedy at law and will be irreparably harmed if the injunction does not issue; (2) the balance of hardships tilts towards plaintiffs; and (3) plaintiffs have at least a reasonable likelihood of success on the merits. Milsen Co. v. Southland Corp., 454 F.2d 363, 367 (7th Cir. 1971).

■ Considering the amorphous character of the case as it is before us, it seems quite clear that plaintiffs have not met their burden of establishing the foregoing requisites for injunctive relief. In any event, we are not persuaded that the district court erred in denying a preliminary injunction which here, of course, would have been basically mandatory in nature.

We have considered other contentions raised by the parties and either deem them to be without merit or not necessary for resolution at this juncture.

For the reasons set out in this opinion, the judgment of dismissal of the five counts is reversed with the cause being remanded for further proceedings consistent with this opinion and the order denying a preliminary injunction is affirmed.

Affirmed in part; reversed and remanded in part.

### On Petition for Rehearing

This matter is before the court on the petition of the defendant-appellee, Andrew Lamb, only, for rehearing.

Upon consideration thereof, we agree with Lamb that he was not associated with the corporation at the time of the plaintiffs' stock purchases. However, as stated in the opinion, "we cannot say, given the present exposition of counts II and III that it appears beyond doubt that the plaintiff can prove no facts sufficient to support a claim for relief under Rule 10b–5." The allegations of these counts encompass a period of time when Lamb apparently was associated with the alleged activities. Whether he was an aider or abettor of or otherwise facilitated a 10b–5 fraud may, as he contends, not be demonstrable on further amendment of the complaint. We merely held that the plaintiffs on remand are not foreclosed from supplementing the allegations relative to Lamb as well as to the other defendants.

Accordingly, the petition for rehearing is denied.

---

19. No preliminary injunction was requested with respect to the defendants' actions alleged in counts II and III (the motion for a preliminary injunction being filed prior to the addition of the present counts II and III to the complaint).