Harvey A. BRAUN et al., Plaintiffs,

v.

NORTHERN OHIO BANK et al., Defendants.

Civ. A. No. C 75–681.

United States District Court, N. D. Ohio, E. D.

Feb. 17, 1977.

Harry C. Nester, David C. Weiner, Zachary T. Paris, Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio, for plaintiffs.

James A. Smith, James M. Porter, Squire, Sanders & Dempsey, Cleveland, Ohio, for Federal Deposit Ins. Corp.

Daniel W. Hammer, Thompson, Hine & Flory, Cleveland, Ohio, for Citizens Bank & Trust Co.

Sterling Newell, Jr., Spieth, Bell, McCurdy & Newell, Cleveland, Ohio, David R. Hyde, Ada Meloy, Cahill Gordon & Reindel, New York City, for Peat, Marwick, Mitchell & Co.

Robert B. Meany, Robert F. Longano, Leanza, Longano, Farina, Mendelsohn & Papandreas, Cleveland, Ohio, for Mario J. Boiardi.

Joseph C. Domiano, Cleveland, Ohio, for Louis A. Kastelic.

David N. Brown, Brown & Brown, Medina, Ohio, for John J. Marquis.

John A. Ritter, Coral Gables, Fla., for John H. Ritter.

James L. Oakar, Cleveland, Ohio, for Richard W. Palmer.

Robert A. Richardson, Terence J. Clark, Cleveland, Ohio, for Bernard L. Plechaty.

Robert S. Balantzow, Nadler, Sokolsky, Bahas & Balantzow, Cleveland, Ohio, for John P. Stewart, Sr.

Alan S. Belkin, Shapiro, Turoff & Gisser, Cleveland, Ohio, for Ronald B. Peltz and Richard W. Schulz.

Robert A. Goodman, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for Bruce B. Felder.

Bruce H. Salomon, Javitch & Greenwald, Cleveland, Ohio, for John F. Sytsma.

Sheldon Berns, Michael H. Diamant, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, Ohio, for Walter A. Zaremba.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

In a multicount action plaintiffs claim damages under the federal securities laws, relying on section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.[1] Additional counts allege state law pendent claims. Federal jurisdiction is founded upon section 27 of the 1934 Act, 15 U.S.C. § 78aa.

Braun and Gregg's amended complaint alleges that in early 1974 they were induced to take part in a plan by Northern Ohio Bank (NOB) to merge with Community National Bank (Community), whereby they and certain officers and directors of NOB[2] would acquire control of Community pending approval of the merger by the relevant regulatory authorities. Pursuant to this plan plaintiffs allegedly did in fact join in a tender offer for at least 51% of Community shares at a price of $44 a share, financing their purchases with loans from NOB and the Citizens Bank and Trust Company of Park Ridge, Illinois (Citizens). This tender offer was successful, but plaintiffs go on to claim that

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, nor misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

---

1. Section 10(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

2. The other participants in the tender offer who, unlike Braun and Gregg, were all members of the NOB board of directors, were Richard W. Palmer, chairman and president of NOB, Mario J. Boiardi, Ronald B. Peltz, Richard W. Schulz, John P. Stewart, Sr., and Bernard L. Plechaty.

By reason of the seriously deficient operating and financial condition of defendant Northern, which condition was not disclosed to plaintiffs in connection with their purchase of common stock of Community as a result of the misrepresentations, omissions and materially false and misleading financial statements hereinabove alleged, (a) defendant FDIC refused to approve such merger and application for such approval was withdrawn by defendant Northern and (b) on or about February 14, 1975 defendant Northern was closed as hereinabove alleged.

Plaintiffs were thus left holding their Community stock, which, they say, had subsequently declined in value, and liable upon the notes they had signed to finance the acquisition of the Community stock.

As is apparent from the above quotation, plaintiffs allege that the true condition of NOB was concealed in many material respects, and that they would not have bought the Community stock had they known the truth about NOB. In addition to NOB itself, represented by the Federal Deposit Insurance Corporation (FDIC) in its capacity as receiver for NOB, plaintiffs sue FDIC in its corporate capacity, Peat, Marwick, Mitchell & Co. (PMM), NOB's independent outside auditor, and Citizens. In their amended complaint Braun and Gregg also named as defendants all members of the NOB board of directors who were members or alternate members of the bank's executive or audit and examining committees.[3] In its capacity as receiver for NOB the FDIC has answered and filed cross claims against the members of the NOB board of directors who participated in the tender offer for the Community stock.[4]

Claims and counterclaims have been filed with regard to the notes executed by the plaintiffs, but it is not pertinent to the subject of this memorandum to detail them.

Defendant PMM has filed a motion to dismiss on the grounds that plaintiffs lack standing to sue and that Braun and Gregg's complaint does not adequately allege the scienter necessary to establish a cause of action against a Rule 10b–5 defendant. All individual defendants except Peltz and Schulz[5] have moved to dismiss and adopted as their grounds the arguments of PMM. Defendant Bruce Felder has also moved to dismiss and briefed the motion to dismiss extensively, arguing that plaintiffs have failed to state a claim upon which relief may be granted, and certain other defendants have made shorter contributions to the arguments. In its corporate capacity the FDIC has also moved to dismiss the complaint, but the grounds for this motion do not involve the securities laws and will be dealt with in a separate memorandum.

### I.

Due to the similarity of the allegations of this complaint to the allegations treated at length in the opinion overruling the motions to dismiss in *Imperial Supply Co., Inc., Profit Sharing Trust et al. v. Northern Ohio Bank et al.*, D.C., 430 F.Supp. 339, issued December 13, 1976, with regard to the concealment or misrepresentation of various facets of the condition of NOB, little discussion is required here of the sufficiency of the complaint to state a claim that the defendants did in fact conceal or omit material information concerning NOB. The primary difference between this case and *Imperial Supply* lies in

---

**3.** The individuals sued were all members or alternate members of either the executive or audit and examining committees of NOB. Two of these defendants, Ronald Peltz and Richard W. Schulz, who also participated in the tender offer and signed notes to finance their Community purchases, have filed suit against NOB, Citizens, the FDIC, and the Continental Bank of Cleveland (not a party in the present case), on grounds highly similar to those that form the basis for the present action. Through the mechanism of cross, counter, and third-party

complaints, all claims in the Peltz and Schulz action, C76–8, have also been put at issue in this action. The various motions in the Peltz and Schulz case, however, will be treated in separate memoranda.

**4.** See note 2, *supra.*

**5.** Since their own action is based on a similar theory, Peltz and Schulz could hardly move to dismiss this case.

the manner in which the claimed misrepresentations were allegedly communicated—here primarily in oral communications by members of the NOB board to Braun and Gregg, combined with the 1973 financial statements.[6] The *Imperial Supply* rulings, however, are deemed pertinent here. As thus adopted it is determined that plaintiffs' claims adequately allege deception cognizable under Rule 10b–5.

PMM presses the claim here that the allegation that it "knew or should have known" that there were material misrepresentations and omissions in the 1973 financial statements it audited does not allege scienter in the manner required by Rule 9(b), Federal Rules of Civil Procedure, in light of the Supreme Court's ruling concerning the need to prove scienter in Rule 10b–5 cases in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Dealing with a similar contention by PMM in the case of *Peltz v. Northern Ohio Bank et al.*, D.C., 430 F.Supp. 382, this court ruled on December 23, 1976, that

> . . . scienter . . . requires proof of either actual knowledge of misrepresentations or "wilfull or reckless disregard for the truth." The word "knew" meets the first half of this requirement, but "should have known" may not be equated in this court's view with "reckless disregard for the truth."

*Id.* at 384 (footnote omitted).

Plaintiffs' allegations of knowledge thus sufficiently claim scienter on the part of PMM, although the words "should have known" will require amendment if plaintiffs desire to press a claim of reckless disregard for the truth.[7] As to contentions set forth by Felder and several other defendants[8] that their parts in perpetrating the claimed misrepresentations are not alleged with sufficient specificity, this court finds, as it did in *Imperial Supply*, that the nature of the alleged misrepresentations is clear enough, and that plaintiffs have adequately alleged active involvement in the communication of such misrepresentations by the individual defendants. Felder's citation of *Lanza v. Drexel & Co.*, 479 F.2d 1277 (2 Cir. 1973), is inapposite, for, as plaintiffs point out, *Lanza* involved a judgment upon a fully developed factual record following a trial on the merits. Of course, the court makes no judgment at this point concerning the likelihood of plaintiffs being able to prove their allegations—against outside directors like Felder or anyone else. The basic allegations of wrongdoing having been found sufficient, however, it becomes necessary to explore the scope of the private right of action under Rule 10b–5 to decide whether plaintiffs' cause of action may proceed.

## II.

PMM presents its principal arguments in support of its motion to dismiss in terms of "standing," citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Briefly, PMM argues that it may not be sued, (1) because the alleged misrepresentations and omissions did not concern the stock the plaintiffs actually purchased, that of Community, and no argument based upon showing a "causal nexus" between the misrepresenta-

---

6. In the seventh count of their amended complaint, paragraphs 42–45, plaintiffs identify a letter written on February 6, 1974, which they say contractually bound the bank to hold them harmless for any losses they might suffer as a result of their participation in the tender offer. In the course of briefing plaintiffs have also referred to certain representations allegedly made in this letter concerning the likelihood of the consummation of the merger. Thus the evidence may reveal other forms of communication with the plaintiffs beside oral representations and the 1973 annual report.

7. Count II of plaintiffs' amended complaint, which apparently seeks to state a pendent common law fraud claim, does allege that the individual defendants made the deceptive statements detailed in count I (the 10b–5 count) either knowingly or with "conscious and reckless disregard of the rights of plaintiffs," and that Citizens and PMM "participated in and aided and abetted such deception and fraud."

8. The other defendants who make this argument are Richard Palmer, Mario Boiardi, John J. Marquis, Bernard Plechaty, John P. Stewart, Sr., and Walter A. Zaremba.

tions concerning NOB and the purchase of Community stock will suffice to overcome this lack of standing, (2) because plaintiffs' pleadings do not show that they suffered any loss as a result of the Rule 10b–5 violations, and (3) because PMM, as the auditor of one corporation, owed no duty, as a matter of law, to the purchasers of another corporations' stock.[9] Although his arguments are not identical to those presented by PMM, defendant Felder's briefs concentrate on propositions similar to the last two described above. His arguments, however, are not stated in terms of standing.

*Blue Chip*, in confirming the validity of the so-called *Birnbaum*[10] rule, holds that a person who was not an actual purchaser or seller of a security has no standing to bring an action for damages based on Rule 10b–5 violations. PMM's first argument relies upon *Blue Chip* itself and can properly be viewed in terms of standing, or the right of plaintiffs even to come into court and argue that they have pleaded a meritorious cause of action. Although this court acknowledges that PMM's and Felder's other arguments might be viewed in terms of standing, only the first contention will be discussed in those terms.[11] "The ability of a plaintiff to prove causation and damages is relevant to the disposition of the merits, not to a determination of whether or not a certain plaintiff is properly before the court." *Manor Drug Stores v. Blue Chip*

*Stamps*, 492 F.2d 136, 142, 144 (9 Cir. 1973) (Hufstedler, J., dissenting), *rev'd, Blue Chip Stamps v. Manor Drug Stores, supra.*[12]

### A.

PMM bases its argument that plaintiffs have no standing to sue upon several passages in *Blue Chip*. Justice Rehnquist first defined the issue considered there as

. . . whether the offerees of a stock offering, made pursuant to an antitrust decree . . ., may maintain a private cause of action where they allege that the offeree has violated the provisions of Rule 10b–5 . . ., but where *they have neither purchased nor sold any of the offered shares*." [Emphasis supplied.]

421 U.S. at 725, 95 S.Ct. at 1920. Two pages later he repeated:

The only portion of the litigation . . which is before us is whether respondent may base its action on Rule 10b–5 . . without having either bought or sold *the securities described in the misleading prospectus.*

*Id.* at 727, 95 S.Ct. at 1921 (emphasis supplied).

Finally, in discussing the policy considerations that support the retention of the *Birnbaum* rule, Justice Rehnquist said:

The virtue of the *Birnbaum* rule, simply stated, in this situation, is that *it limits*

**9.** The issues are broken down in this fashion in PMM's reply brief. In its initial brief in support of its motion to dismiss PMM stated its arguments in terms of issues (1) and (3).

**10.** *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2 Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

**11.** As Judge Engel, quoting Judge Tamm of the D.C. Circuit, said recently concerning the concept of standing in a case dealing with Rule 10b–5, *Fridrich v. Bradford*, 542 F.2d 307, 316 n. 21 (6 Cir. 1976), "[it] is one of the most amorphus concepts in the entire domain of the public law." *Fridrich* determined that a contemporaneously trading private plaintiff has no cause of action against a party privy to inside information who trades on the basis of such information (admittedly a Rule 10b–5 violation) unless he can show that the insider's trading influenced his decision to buy or sell. Prior to

commenting on the nature of the standing doctrine, Judge Engel wrote:

We have seriously considered but have declined to place final reliance upon any claim of lack of standing within the meaning of *Birnbaum* or *Blue Chip*.

**12.** The argument that plaintiffs have suffered no loss as a result of the alleged Rule 10b–5 violations comes closest to being stated in terms of the traditional doctrine of standing—*i. e.*, the ability to show some personal stake in the outcome of the litigation. But the defendants' arguments on this point do not really claim that plaintiffs suffered *no loss* (cf. *Abrahamson v. Fleschner*, 392 F.Supp. 740 (S.D.N.Y.1975)). Rather, they claim that plaintiffs' losses cannot properly be seen as having been caused by defendants' alleged Rule 10b–5 violations. The court, again, does not view that question as being one of standing.

*the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates.*

*Id.* at 747, 95 S.Ct. at 1931 (emphasis supplied). With some facial justification, PMM interprets the underlined portions of these passages to indicate that a person has no standing to sue under Rule 10b–5 if he bought or sold the securities of a different corporation than that to which the alleged misrepresentations directly related. Plaintiffs argue in response that this was not the issue before the Court in *Blue Chip.* For the reasons that follow this court, on balance, concludes that these passages may not be interpreted in the literal manner sought by PMM. To do so would ignore the total context of the quoted passages and the reasons given by the Supreme Court for approving the *Birnbaum* rule.

The opinion of the Court, particularly supported by Justices Powell, Stewart, and Marshall in concurrence, first examines the language and legislative history of the securities acts, with substantial emphasis upon the relationship between section 10(b) of the 1934 Act and the other provisions of the 1933 and 1934 Acts that set forth explicit statutory causes of action. The Court found it persuasive that these explicit statutory actions are available only to actual purchasers or sellers of securities. It is likewise appropriate that some examination of these sections be undertaken for possible aid in deciding the present case,[13] which presents an issue of standing that is really a subset to that in *Blue Chip.*

The "principal express nonderivative private civil remedies," as Justice Rehnquist called them, are sections 11(a) and 12 of the 1933 Act, 15 U.S.C. §§ 77k(a) and 77*l*, and sections 9 and 18 of the 1934 Act, 15 U.S.C. §§ 78i and 78r. The first two of these sections provide causes of action against parties responsible for the issuance of misleading information in the initial offering of securities. It is apparent from the words "any person acquiring *such security*" (§ 11) and "the person purchasing *such security*" (§ 12) (emphasis added) that these sections only create causes of action in favor of buyers of the security to which the representations immediately relate.[14]

---

**13.** In *Ernst & Ernst v. Hochfelder, supra,* Justice Powell concentrated entirely upon the interrelationship of the provisions of the 1933 and 1934 Acts, and the legislative history of § 10(b), in deciding that conscious manipulation or fraud must be shown to hold a defendant liable under Rule 10b–5. He noted that

As we find the language and history of § 10(b) dispositive of the appropriate standard of liability, there is no occasion to examine the additional considerations of "policy," set forth by the parties, that may have influenced the lawmakers in their formulation of the statute.

425 U.S. at 214 n. 33, 96 S.Ct. at 1391. The approach taken in *Hochfelder* of relying exclusively on the statute and legislative history makes it essential to examine the statutory interrelationships in this case.

**14.** Although the plaintiffs dispute its application (without supporting reasons), a similar analysis clearly applies to Ohio Rev.Code § 1707.41 and § 1707.43, upon which, as a pendent count, plaintiffs seek to base their third claim for relief. Section 1707.41 provides, in pertinent part, that

In addition to the other liabilities imposed by law any person who, by a written or printed circular, prospectus, or advertisement, offers any security for sale, or receives the profits accruing from such sale, is liable, to any person who purchases such security relying on such circular, prospectus, or advertisement, for the loss or damage sustained by such relying person by reason of the falsity of any material statement contained therein, unless such offerer or person who receives the profits establishes that he had no knowledge of the publication thereof prior to the transaction complained of, or had just and reasonable grounds to believe such statement to be true.

Since only Community stock was actually purchased, and there is no allegation that any defendant offered Community stock for sale, there is plainly no cause of action available upon the basis of § 1707.41.

The applicable portion of § 1707.43 reads: Every sale or contract for sale made in violation of sections 1707.01 to 1707.45, inclusive, of the Revised Code, is voidable at the election of the purchaser. The person making such sale or contract for sale, and every person who has participated in or aided the seller in any way in making such sale or contract for sale, are jointly and severally liable to such purchaser, in an action at law in any court of competent jurisdiction, upon tender to the seller in person or in open court of the securities sold or of the contract made,

Section 9 of the 1934 Act, which deals with certain trading manipulations, provides a cause of action in favor of "any person who shall purchase or sell any security at a price which was affected by [an act or transaction prohibited by other parts of section 9]." Section 18 creates a cause of action in favor of a purchaser or seller of "a security" who relied to his detriment upon false information in certain reports and documents required to be filed with the SEC. By contrast to the 1933 Act sections, there is no requirement deriving from a logical reading of the 1934 Act sections themselves that the security purchased or sold be the security directly manipulated, or to which the section 18 misrepresentations directly related. This is equally true of section 10(b). Thus it is not possible here, as it was in *Blue Chip,* to move from the solid ground of explicit statutory language to reasoning by analogy that would fix corresponding contours of a judicially implied cause of action.

Moreover, although cases interpreting sections 9 and 18 are not nearly so numerous as Rule 10b–5 cases, at least one significant case, *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 380–83 (2 Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973), has considered a section 9 claim in a context that virtually requires the conclusion that the court found no difficulty in the concept of allowing suit by the buyers of one company's stock for damages caused by the effects of manipulation of another company's stock, part of the same transaction. Several aspects of *Chris-Craft* have been granted certiorari and are currently awaiting decision in the Supreme Court. See 516 F.2d 172 (2 Cir. 1975), *cert. granted,* 425 U.S. 910, 96 S.Ct. 1505, 47

L.Ed.2d 760 (1976). The case involved the contest between Chris-Craft and the Bangor Punta Corporation for control of the Piper Aircraft Corporation. Among the welter of claims made in the several cases that arose out of the no-holds-barred contest was one by Bangor Punta against Chris-Craft alleging that Bangor Punta had been forced to pay an excessively high price for Piper stock because of manipulations in the price of Chris-Craft stock. The connection between the price of Chris-Craft stock and that of Piper was that Chris-Craft, after having bought a substantial amount of Piper stock in a tender offer, had made an exchange offer for enough more Piper stock to acquire control. Thus if the price of Chris-Craft stock had been manipulated to be higher than it would otherwise have been, Piper stockholders might have been influenced to hold out for a higher price at which to sell their stock to Bangor Punta.

Sustaining a factual finding by the district court, the court of appeals in *Chris-Craft* held that Bangor Punta had failed to prove that any intentional manipulation of the price of Chris-Craft stock had actually taken place. But, of course, it would not have been necessary even to examine the question of whether manipulation had been proved if the court had perceived any difficulty with regard to Bangor Punta's standing to complain, on the grounds that it bought Piper and not Chris-Craft stock. Coming as it does from a panel of the circuit that first established, and never abandoned, the *Birnbaum* rule, there is apparent recognition that Bangor Punta had standing to bring a section 9 cause of action for effect on the value of Piper stock by Chris-Craft's alleged sections 9 violations. This reasonable reading of *Chris-Craft* that

---

for the full amount paid by such purchaser and for all taxable court costs, unless the court determines that the violation did not materially affect the protection contemplated by the violated provision.

The earlier sections of chapter 1707, from § 1707.01 to § 1707.39, deal with the registration of offerings of securities and of brokers and dealers. An examination of these sections does not reveal any provision that appears to cover the conduct with which defendants are

accused. Further, § 1707.43 imposes liability upon "[t]he person making such sale or contract for sale, and every person who has participated in any way in *making such sale* or contract for sale." The court is unable to see how the conduct plaintiffs allege defendants to have engaged in can be characterized as participation in making a "sale or contract for sale," even when the words "in any way" are added. Therefore, the third claim of the amended complaint is hereby dismissed.

the express cause of action created by section 9 of the 1934 Act extends to the purchaser of a security closely related to a different company's security manipulated in violation of section 9 supports the conclusion that a purchaser of a security of one company has standing to bring a Rule 10b–5 action based upon misrepresentations with regard to the financial condition of a closely related company.

In dealing "with private actions under Rule 10b–5," the Court in *Blue Chip* noted that it was dealing "with a judicial oak which has grown from little more than a legislative acorn." The Court, therefore, thought it proper to weigh "policy considerations" when "we come to flesh out the portions of the law with respect to which neither the congressional enactment nor the administrative regulations offer conclusive guidance." 421 U.S. at 737, 95 S.Ct. at 1926. A review of these "policy considerations" does not require the conclusion, urged by PMM, that *Blue Chip* denies standing to the plaintiffs here.

Centering on recognition that "litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and kind from that which accompanies litigation in general," the Court expressed the belief that this concern has "largely two separate grounds." Summarizing the first, the Court stated:

> [I]n this type of litigation, where the mere existence of an unresolved lawsuit has settlement value to the plaintiff not only because of the possibility that he may prevail on the merits, an entirely legitimate component of settlement value, but because of the threat of extensive recovery and disruption of normal business activities which may accompany a lawsuit which is groundless in any event, but cannot be proved so before trial, such a factor is not to be totally dismissed. The *Birnbaum* rule undoubtedly excludes plaintiffs who have in fact been damaged by violations of Rule 10b–5, and to that extent it is undesirable. But it also separates in a readily demonstrable manner the group of plaintiffs who actually pur-

chased or actually sold, and whose version of the facts is therefore more likely to be believed by the trier of fact, from the vastly larger world of potential plaintiffs who might successfully allege a claim but could seldom succeed in proving it. And this fact is one of its advantages.

421 U.S. at 742–43, 95 S.Ct. at 1928. Plaintiffs Braun and Gregg, patently, fall within "the group of plaintiffs who actually purchased or actually sold."

As a second ground for "fear of vexatious litigation" the Court stated as a basis

> . . . concern that, given the generalized contours of liability, the abolition of the *Birnbaum* rule would throw open to the trier of fact many rather hazy issues of historical fact the proof of which depended almost entirely on oral testimony.

*Id.* at 743, 95 S.Ct. at 1929. Detailing this second "policy consideration," the Court stated:

> The very real risk in permitting those in respondent's position to sue under Rule 10b–5 is that the door will be open to recovery of substantial damages on the part of one who offers only his own testimony to prove that he ever consulted a prospectus of the issuer, that he paid any attention to it, or that the representations contained in it damaged him. The virtue of the *Birnbaum* rule, simply stated, in this situation, is that it limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates. And their dealing in the security, whether by way of purchase or sale, will generally be an objectively demonstrable fact in an area of the law otherwise very much dependent upon oral testimony.

*Id.* at 746–47, 95 S.Ct. at 1930 (footnote omitted).

Plaintiffs' claim that this concern is not relevant to their case is not entirely accurate. The risk that a purchaser or seller will rely upon oral testimony to make out his case, or cast about for someone to sue out of dissatisfaction with his investment, is greater if the Rule 10b–5 violation is said to

have affected a transaction in the securities of an altogether different company than is this risk if the stock purchased is that of the company to which the representations directly related. This risk is controlled if there must not only be a purchase of a security, as the *Birnbaum* rule requires, but the Rule 10b–5 action involving that security must be based upon misrepresentations with regard to the financial condition of the same or closely related company. Without attempting to list all types of relationships that might meet this requirement, standing should at least be granted where the company has a direct management interest in, or proposes to merge with or acquire the company whose securities are purchased.

In the end weighing these policy considerations "together with the precedential

support for the *Birnbaum* rule over a period of more than 20 years, and the consistency of that rule with what [could be] glean[ed] from the intent of Congress," the Court in *Blue Chip* concluded that the *Birnbaum* rule is "sound" and "should be followed." Unlike the *Birnbaum* rule there is no substantial precedential support for PMM's position on standing. Thus *Blue Chip,* read in light of the reasons underlying its holding, does not, in this court's view, deprive plaintiffs of standing in this action.[15]

### B.

PMM's other grounds for dismissal require joint discussion, in conjunction with the arguments of Bruce Felder. Taking PMM's last contention first, it is argued that, even if it could be said that material

15. Defendants also point to *Gearheart v. Federal Reserve Bank of Cleveland*, 516 F.2d 353 (6 Cir.), *cert. denied,* 423 U.S. 927, 96 S.Ct. 274, 46 L.Ed.2d 254 (1975), as authority for their contentions concerning standing. There plaintiffs, who had bought $10,000 certificates of deposit from the Provident Bank in Cincinnati, attempted to sue Provident, a number of other Cincinnati banks, and the Federal Reserve Bank of Cleveland, on the grounds, *inter alia,* that they had been deceived because nobody had told them that there was a limit on the interest rates that could be paid for certificates of up to $100,000, but no limit on rates for amounts above $100,000. Citing *Simmons v. Wolfson,* 428 F.2d 455 (6 Cir. 1970), *cert. denied,* 400 U.S. 999, 91 S.Ct. 459, 27 L.Ed.2d 450 (1971), the court said:

> The District Court noted that Appellants each purchased a $10,000 certificate from Appellee Provident Bank. The District Court properly concluded that Appellants thus lack standing to sue banks other than Provident.

*Simmons,* a short opinion approving and reiterating the *Birnbaum* rule, says nothing relevant to the issue of whether the misrepresentations need relate to the stock purchased to allow standing. The brief statement quoted from *Gearheart,* however, does support defendants' position. Plaintiffs urge that *Gearheart* is distinguishable on the grounds that there was clearly no connection shown between the conduct of the other banks and plaintiffs' purchases of the certificates. In this case plaintiffs have, by contrast, alleged that it was principally information about NOB that induced them to buy the Community stock. Plaintiffs' attempt to distinguish *Gearheart* will not suffice because it does not go to the issue of standing. The separate nature of this issue is lucidly

explained by Judge Hufstedler in her *Blue Chip* dissent, *supra,* 492 F.2d at 146:

> At the heart of the majority's inability to justify its exception to the purchaser-seller rule is what I believe to be a basic misunderstanding of the role of a standing requirement in the context of securities litigation. The majority apparently believes that any plaintiff who can credibly allege the substantive elements of a cause of action should be granted standing. However, even if litigants can allege and even prove all of the elements of a section 10(b) damage claim, they nonetheless may lack standing. The standing doctrine is not designed to thwart actions by persons who have not suffered any injury from a wrong. It is a means of foreclosing actions by persons who have been hurt by wrongs, but who, for reasons of legislative, judicial, or social policy, are outside of the class of persons who are given a particular kind of remedy for the injury. A federal standing requirement insures that litigants are sufficiently adverse to satisfy the case or controversy requisite of Article III of the Constitution, and it confines the persons who may bring suit to those whom Congress intended to provide the remedy invoked in a particular controversy. [Footnote omitted.]

However, this court concludes that *Gearheart,* while it does deal with standing, does not govern the present case. There the only relationship between the companies lay in their common engagement in a particular type of trade or commerce. As is explained in the text situations do exist, and this is one, where the relationship between corporations is sufficiently close that information about one will affect the trading in the securities of another.

misrepresentations with regard to the condition of NOB caused the plaintiffs to purchase their Community stock and led to some injury cognizable in a Rule 10b–5 suit, PMM nevertheless owed no duty to the purchasers of Community shares. In part this claim is based upon the claim that the 1973 NOB financial statement allegedly examined by plaintiffs had not been officially certified by PMM at the time of such examination. Plaintiffs dispute this assertion, claiming, *inter alia,* that the 1973 statement was certified on January 11, 1974, well prior to the consummation of the tender offer. For purposes of this motion to dismiss it must be assumed that plaintiffs did in fact examine a financial statement certified by PMM.

█ This court has previously held that, in contrast to the uncertified financial statements intended for internal corporate use that were involved in *Landy v. FDIC,* 486 F.2d 139 (3 Cir. 1973), and *Wessel v. Buhler,* 437 F.2d 279 (9 Cir. 1971), an allegation that a plaintiff relied upon financial statements certified by an accountant in its capacity as an independent public accountant gives rise to a substantial factual issue as to whether "the accountant's reports were made in a manner reasonably calculated to influence [investors]." *Transairco, Inc. v. R. Paul Sprague,* Civil Action No. C 73–135 (N.D.Ohio April 10, 1975) at 10 (quoting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 862 (2 Cir. 1968)). Such a showing is necessary to establish the "in connection with the purchase or sale of any security" element of a Rule 10b–5 action.

█ PMM contends further, however, that even if it can be said to have had a duty toward purchasers of NOB stock, it had no duty whatever toward purchasers of Community stock. This contention is not tenable in view of paragraph 18 of plaintiffs' amended complaint. It begins:

Defendant PMM, during the course of its audit and at January 11, 1974, the date of its opinion with respect to said 1973 financial statements of defendant Northern, knew or should have known that defendant Northern and the individual defendants intended to publish, distribute and deliver said 1973 financial statements and PMM's accountant's opinion to shareholders, creditors, investors and other persons with whom defendant Northern would have significant financial and business dealings, such as the plaintiffs.

Plaintiffs' next allegations particularly charge PMM's responsibility:

Prior to the consummation of the tender offer for shares of common stock of Community herein referred to, defendant PMM knew or should have known of the participation by plaintiffs, at the instance of defendant Northern and the individual defendants, in such tender offer and knew or should have known, that in connection with such purchase of shares of common stock of Community, plaintiffs would receive and rely upon said 1973 financial statements of defendant Northern. During the period when they had knowledge of such facts, defendant PMM also knew or should have known that said 1973 financial statements of defendant Northern were materially false and misleading in the respects set forth above but failed to correct such statements although it had a duty to do so.

At trial it will be necessary for plaintiffs to show that PMM either knew or would have reasonably expected that the 1973 NOB financial statement would be used to solicit participation in the Community tender offer. However, although PMM's position is plausible, the court rejects the contention that PMM's status as an accountant gives it some immunity not possessed by other defendants.[16] It is conclud-

16. PMM accurately states that the case of *Caddell v. Goodbody & Co.,* [1973] CCH Fed.Sec.L. Rep. ¶ 93,938 (N.D.Ala.1972), "which is perhaps the most analogous [to this case] factually of any presented to [or found by] this Court," supports its position that it owed "no duty" to the purchasers of Community stock. In *Caddell* plaintiffs, who had bought stock in a hamburger chain whose largest stockholder was Goodbody & Company, sought to sue Goodbody, the New York Stock Exchange, and Ernst & Ernst, Goodbody's accountants, on the

ed, rather, that plaintiffs have not only stated a sufficient cause of action with regard to the defendants in general, but they have also, in paragraph 18, alleged a valid claim against PMM.

In their arguments over the proper construction of the phrase "in connection with the purchase or sale of any security" as applied to the allegations in this case, all parties have focused upon the case of *Superintendent of Insurance v. Bankers Life and Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), and Justice Douglas's language quoted below. There the plaintiff, an insurance company which by then was represented by the New York Superintendent of Insurance, had been taken over by an individual who caused it to sell its portfolio of United States Treasury bonds and then, through a complicated series of transactions, immediately converted the proceeds to his own use and benefit. Reversing the Second Circuit, the Court said:

> [W]e do not read § 10(b) as narrowly as the Court of Appeals; it is not "limited to preserving the integrity of the securities markets" (430 F.2d 355, at 361), though that purpose is included. Section 10(b) must be read flexibly, not technically or restrictively. Since there was a "sale" of a security and since fraud was used "in connection with" it, there is redress under § 10(b), whatever might be available as a remedy under state law.

\*    \*    \*    \*    \*    \*

The crux of the present case is that [the defrauded corporation] suffered an injury

---

grounds that misrepresentations and misleading omissions concerning the condition of Goodbody affected the accuracy of representations made about Goodbody's plans for the hamburger chain. Deciding motions for summary judgment, the court first held that in fact Ernst & Ernst had not misrepresented anything. The court went on to note, though, that

> Even if these "flaws" had significance, the question would remain whether the NYSE or Ernst was under any duty with respect thereto vis-a-vis these plaintiffs.
>
> \*    \*    \*    \*    \*    \*
>
> Although the alleged factual situations and theories of liability varied, every case cited [by plaintiffs in *Caddell*] involved misrepresentations as to the net worth of the companies involved and transactions in the shares of the company about which the financial statement was made. The case here differs in both of those crucial aspects: plaintiffs do not allege that the net worth of Goodbody was misrepresented, and the transaction which caused their loss was in shares of a company other than Goodbody.
>
> The plaintiffs here urge that this problem may be cured by a broad interpretation of the phrase "in connection with" of Rule 10b(5) and cite *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir. 1968), and *Heit v. Weitzen,* 402 F.2d 909 (2d Cir. 1968), in support of that position. There is nothing in those decisions to indicate that misstatements about one company's financial condition will create liability for a loss from a sale or purchase of another corporation's securities. It is, in fact, a broad interpretation of "in connection with" to hold that financial statements made at regular intervals and not specifically for

promoting stock sales are "in connection with" every sale of securities to a private investor who alleges that he read and relied on such a statement.

> \*    \*    \*    \*    \*    \*
>
> This court is convinced that Ernst & Ernst performed its duty to potential investors of Goodbody & Co. The plaintiffs have been unable to show that a duty ever arose to potential investors of Florida Capital; had they done so it is unreasonable that it could be a broader duty than that which existed and was fulfilled to the potential investors of Goodbody.

*Id.* at 93,739–40.

In assessing *Caddell* it is important to note that the case was not dismissed against Goodbody. If *Caddell* is read as literally as PMM desires, even a showing that Ernst & Ernst deliberately misrepresented the condition of Goodbody would not have subjected it to any liability to the plaintiffs, although Goodbody itself would presumably have been liable. It should also be borne in mind that in light of *Ernst & Ernst v. Hochfelder,* supra, knowing misrepresentation, or at least wilfull and reckless disregard of the truth, must be proved by the plaintiffs here against PMM. It should also be remembered that plaintiffs allege that PMM *knew* that its audited statement would be used in the Community tender offer. Therefore, insofar as *Caddell* expresses a contrary view that would require the dismissal of this case upon the grounds of "no duty," this court declines to follow it. *See also Competitive Associates v. Laventhol, Krekstein, Horwath & Horwath,* 516 F.2d 811 (2 Cir. 1975), for a contrary view to that taken by the court in *Caddell.*

as a result of deceptive practices touching its sale of securities as an investor.

*Id.* at 12–13, 92 S.Ct. at 169.

Since this court dealt with the last sentence quoted above in the motion to dismiss opinion in the *Imperial Supply* case, it is appropriate to begin this discussion with the quotation of the relevant portion of that opinion:

> Undoubtedly Justice Douglas used the term "touching its sale" as a figurative restatement of Rule 10b–5's "in connection with the purchase or sale of any security." This "nexus," as it has become known, between a Rule 10b–5 violation and the "purchase or sale of any security" is determined to be the statutory equivalent of the element of tort causation.
>
> . . .
>
> In addition, Justice Douglas speaks of the defrauded corporation "suffer[ing] an injury as a result of deceptive practices." This adds a second element of causation but one not found in Rule 10b–5. This element of causation, as the plaintiffs say, the courts have borrowed from the law of torts. The "nexus" requirement though statutory in origin, also properly should be treated as an element of causation. Indeed, obviously referring to the nexus requirement, *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), speaks of "the requisite element of causation in fact." Phrased differently but meaning the same thing, *Schlick v. Penn-Dixie Cement Corp.,* [507 F.2d 374, 380 (2 Cir.), *cert. denied,* 421 U.S. 976, 95 S.Ct.

1976, 44 L.Ed.2d 467 (1974)], first talks of "the causation question" but then divides "causation" into "transaction causation," meaning "that the violations in question caused the [plaintiff] to engage in the transaction in question," and "loss causation," meaning "that the misrepresentations or omissions caused the economic harm." . . .

*Id.* at 361.

Defendant Felder has devoted substantial discussion to the distinction developed in *Schlick* between transaction causation and loss causation, contending essentially that, although plaintiffs can plausibly claim that the alleged misrepresentations concerning NOB in fact were the critical element that induced them to join in the tender offer group ("transaction causation"), they cannot claim that such misconduct caused the damage they have suffered ("loss causation"). PMM goes further, arguing, in terms of standing, that the "touching its sale" formulation of *Bankers Life* does not suffice to confer a right to sue upon these plaintiffs. Insofar as it concerns standing, PMM's argument has already been rejected.[17] In response to Felder plaintiffs counter that the loss-causation transaction-causation distinction has little utility and has not attained general acceptance, but that they have in any case adequately alleged both.

The distinction between the concepts of loss and transaction causation is clearly more helpful in some situations than in others. In *Schlick* itself plaintiffs had alleged that the ratio at which they were

---

**17.** PMM cites the case of *Rochelle v. Marine Midland Grace, etc., Co.,* 535 F.2d 523 (9 Cir. 1976), to support the propositions that plaintiffs "lack standing" in this case, and that the nexus approach to causation that plaintiffs base upon *Bankers Life* is inappropriate. *Rochelle* involved a Rule 10b–5 action by a Chapter X reorganization trustee that sought damages for "corporate waste" against the officers of the company in reorganization. It was alleged that the accused officers had "frittered away" funds that the company had acquired by selling debentures, the registration statements for which had misrepresented various material facts about the company. Certain other misrepresentations had also been adequately alleged. Contrary to PMM's characterization, Judge Hufstedler's opinion in *Rochelle* found that the reorganization trustee had standing. *Id* at 527. However, the court held that, since the company had received full value for its securities, the subsequent misuse of the money (even though it had, perhaps, been obtained by fraud) was not sufficiently connected to the Rule 10b–5 violations to supply a right of action thereunder. This was true, said Judge Hufstedler, even under the "roomy language" of *Bankers Life.* In the present case, however, the alleged violations relate directly to the securities transaction itself. The court finds *Rochelle* persuasive on its own facts but inapplicable to these.

forced to exchange their stock in one corporation for that of another had been influenced, adversely to them, by manipulation of the prices of the respective stocks. "Loss causation"—*i. e.,* economic injury—was thus clear. The thrust of the opinion was toward an analysis of the type of proof required to show that plaintiffs had been forced or induced to enter into the exchange by actions violative of Rule 10b–5. This issue, discussed in footnote 14 of the *Imperial Supply* opinion, required examination of the *type* of Rule 10b–5 violation alleged, but did not, as plaintiffs here accurately point out, require examination of the manner in which damages must be shown to have flowed from a Rule 10b–5 violation. This court, nevertheless, accepts the proposition that a causal link must be shown between the alleged Rule 10b–5 violations and the losses plaintiffs seek to recover as flowing from those violations. Such is the natural interpretation of the statement in *Bankers Life* that "[plaintiff] suffered an injury *as a result* of deceptive practices . . . ." [emphasis added].

In paragraphs 11 through 19 plaintiffs have adequately alleged that they were induced by misrepresentations concerning the condition of NOB to buy Community stock. Thus transaction causation is met. However, basing their initial argument on the type of relief plaintiffs have requested, PMM and Felder have argued that plaintiffs' losses simply were not caused by the alleged 10b–5 violations.

■ Aside from requesting that the notes used to finance the purchases be declared void and unenforceable, and punitive damages based on their pendent common law claims, Braun and Gregg request in their amended complaint the return of the entire purchase price of the Community shares they bought, plus interest costs in connection with the financing of such purchases. In return they offer to transfer to defendants the stock they purchased. Labeling such a measure of damages rescissionary in nature, PMM argues that plaintiffs seek the wrong type of recovery. In itself such an argument would be of little concern, for a motion to dismiss may not be granted on the grounds that the relief prayed for is improper, so long as plaintiffs may be entitled to *some* relief if they are able to prove their claims. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). It is argued, however, that because a rescissional remedy is only appropriate when the value of the *item purchased* has been misrepresented, a purchaser may not claim that he did not get what he bargained for when he actually bought something else. Since it is not claimed that the alleged misrepresentations related to the value of Community stock, defendants say that it could only be claimed that the value of the item acquired was misrepresented if the merger had in fact been consummated and plaintiffs had wound up with $44 worth of NOB stock, valued at the time of the merger. But since the merger was never consummated, all that happened was that they received Community stock, not claimed to be worth less than they paid at the time of purchase, despite its subsequent decline in value.[18]

18. PMM's reliance on *Rich v. Touche Ross & Co.,* 415 F.Supp. 95 (S.D.N.Y.1976), is misplaced. There plaintiffs sought to hold Touche Ross liable for alleged failure to reveal material facts concerning Weis Securities, Inc., a stock broker through whom plaintiffs had bought certain securities, and in whose possession they had left the securities. Weis subsequently went bankrupt, and plaintiffs allegedly did not receive full value for their securities in Weis's possession, which according to statutory procedure were sold by the Securities Investors Protection Corporation (SIPC). The court held that any misrepresentations concerning Weis were not related to the plaintiffs' decision to buy the securities, but solely to their decision to continue their bailment of the securities with Weis. The court also held that the sale of the securities by the SIPC did not bring the plaintiffs within the "forced seller" rule of standing. Hence there was no connection between the alleged Rule 10b–5 violations and the purchase or sale of any security.

PMM relies on *Touche Ross* for the proposition that a Rule 10b–5 action will not lie for losses sustained as a result of merely holding securities. In this case, though, the allegations are sufficient to link the purchase to the misrepresentations and the loss to the purchase, as explained more fully in the text.

Plaintiffs reply, essentially, that, because of their expectation that the merger would take place, they did in fact pay more for the Community stock than it was worth, or at least than they would otherwise have been willing to pay for it if they had purchased for investment purposes on the open market. Further, once having acquired the Community stock, plaintiffs say they continued to hold it in anticipation of the ultimate merger with NOB. It was only when the very fraud that induced them to buy the Community stock in the first place was revealed, upon the collapse of NOB, that plaintiffs discovered that they had been deceived, by which time, as mentioned, the Community stock had significantly declined in value. Thus, plaintiffs say, they certainly suffered some damage, whether its proper measure is the difference between the price of purchase and the open market value of the stock at the time of purchase, the difference between the purchase price and the stock's value at the time that the fraud was revealed, or the difference between the purchase price and the price at which the stock was sold (or its value at the time of judgment if unsold). (In their reply briefs Braun and Gregg adopt this argument, having, apparently, abandoned their original request for rescissionary relief.)

██ Bearing these opposing arguments in mind the sufficiency of plaintiffs' allegations to show loss causation must be ascertained. Plaintiffs themselves insist that the purchase of Community stock was to be but a way station along the route to the acquisition of NOB stock. They allege that Palmer (NOB's president) told them that approval of the merger was "assured," both by NOB stockholders and the federal regulatory authorities.[19] But, it is not alleged how Palmer was in any position to assure the plaintiffs of approval by the regulatory authorities. Nor could he guarantee the approval of the merger by the stockholders of NOB, although it might be assumed that the likelihood of his influence being persuasive with NOB's stockholders would be greater than the likelihood of his succeeding with the regulatory authorities. Indeed, under the tender offer's own terms it could not even be known that the offering group would be able to guarantee the approval of the stockholders of Community, since the offer was for 51% or more of Community's shares and, under federal law (see 12 U.S.C. § 214a), approval of a merger would require a two-thirds majority.[20]

Thus, even conceding that plaintiffs would not have bought the Community stock if they had not been misled about the true condition of NOB, they could have been left holding the Community stock—which would, one has to assume, in the absence of allegations to the contrary, have declined in value anyway—for reasons that had nothing to do with any misrepresentations made about the condition of NOB. Under such circumstances there could indeed by said to be a lack of "loss causation." The only apparent way to bridge this causal gap would be to show that it was the very aspects of the condition of NOB that were being misrepresented that ultimately led to the refusal of the regulatory agencies to approve the merger. Indeed, that is how this court reads paragraph 22, quoted in part, page 2, *supra*. Stated differently, as part of their cause of action plaintiffs will be required to prove that the merger would

**19.** Such assurances were allegedly made in the letter from Palmer to plaintiffs that stated that NOB would hold plaintiffs harmless for any losses they might suffer through the purchase of Community stock. See note 6, *supra*.

**20.** Indeed, the need for a two-thirds majority vote of Community shareholders to approve a merger, and the tender-offer group's consequent inability to guarantee such approval even if the offer succeeded, was noted in the tender offer itself:

If the Purchasers obtain 34,850 Shares pursuant to this Offer to Purchase, they will own approximately 51% of the presently outstanding Shares. The Federal banking laws contain provisions which require cumulative voting in the election of directors and approval by holders of two-thirds of the outstanding Shares to take material corporate actions, including mergers. Therefore, there is no assurance that the ownership of 51% of the outstanding Shares by Purchasers will give them power to effect such material corporate actions.

have taken place had the condition of NOB been as it was represented to be. Since it cannot be said at this stage of the case that plaintiffs will not be able to establish this essential link in loss causation, the motion to dismiss must at this time be overruled, except insofar as it is granted with regard to count III of the complaint in footnote 14.

IT IS SO ORDERED.